(Reap. Dec. 10213)

CHR. BJELLAND & CO., INC. *v.* UNITED STATES

Entry No. 09587, etc.

(Decided March 27, 1962)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel) for the plaintiff. *William H. Orrick, Jr.*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.

WILSON, Judge: These appeals for reappraisement involve certain brisling sardines in olive oil and certain kipper snacks, exported from Norway during the period from March 8, 1958, to December 5, 1959.

The merchandise was appraised on the basis of export value under the provisions of section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, Public Law 927 (70 Stat. 943), T.D. 54165, by reason of the fact that the merchandise in question is not specified in the final list (T.D. 54521), published by the Secretary of the Treasury, pursuant to section 6(a) of said Public Law 927.

The provisions of section 402 of the Tariff Act of 1930, as amended, *supra*, relevant to the issue herein are as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise.

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

At the trial, the record in the case of *Chr. Bjelland & Co., Inc.* v. *United States*, 45 Cust. Ct. 435, Reap. Dec. 9753, was incorporated with the record in the case at bar. An affidavit of Olav Omland, secretary general of the Export Committee for Norwegian Canned Fish Products, was also received in evidence (plaintiff's exhibit 2). In addition, plaintiff called two witnesses and the defendant called the manager of the plaintiff corporation. It was agreed between counsel for the parties herein that the exporter at bar limited its sales for exportation to the United States to two purchasers, i.e., Chr. Bjelland & Co., Inc., of New York and P. V. Bright & Co., Chicago, Ill., who purchased at the same prices and terms and did not sell or freely offer to any other United States purchaser.

The affidavit of Chr. W. Bjelland (plaintiff's exhibit 1 in Reap. Dec. 9753, *supra*), sets forth the conditions and practices under which the exporter did business with the two United States purchasers and was summarized in the aforesaid decision as follows:

(1) The two purchasers were not permitted to purchase sardines or kippered herring from any other packer than the exporter.

(2) They were required to defray some or all of the costs for advertising the exporter's products in the United States, the minimum amounts to be spent and the percentage of the costs to be borne by each purchaser to be determined solely by the exporter.

(3) They were required to pay for the goods at the time of shipment.

(4) They were required to maintain warehouse facilities at various places, so as to be able to make spot deliveries when required.

(5) They were required to guarantee their customers' floor stocks against price decreases, without reimbursement from the exporter.

(6) They were required to furnish product liability insurance.

(7) They were required to assume full responsibility for replacement or make allowances for "spoils" and "swells."

(8) The prices were determined solely by the exporter, were not subject to negotiation, and could be changed after the merchandise had been shipped.

(9) One of the purchasers was a wholly owned subsidiary as to the policies of which the exporter exercised absolute and complete control. The other

purchaser was required to advance at the beginning of the packing season as much capital as the exporter estimated it would require.

The affidavit of Olav Omland (plaintiff's exhibit 2), after stating that, by virtue of his employment, he was familiar with the export practices employed by the Norwegian canned fish exporters operating on the United States market, recites in part as follows:

1) Sales of canned fish are primarily made from Norwegian canning factories and exporters direct to importers in the U.S.A.—to a lesser extent through U.S. agents.

The general routine is that offers giving details of prices, payment and delivery terms are submitted to the U.S. buyers and must be accepted by them before a sale can be concluded. It is not usual that the sales contract stipulates any conditions as regards the buyer's re-sale of the merchandise. It is also extremely seldom that the seller makes any sale conditional of any obligation on the part of the buyer to confine his purchases of such merchandise to the seller, or to carry a minimum stock at any time.

2) The usual Norwegian sales terms are net FOB or CIF U.S. sea port.

3) The usual payment terms are Cash Against Documents on arrival of the merchandise at American port.

4) It is usual that the Norwegian seller gives a guarantee against decline in prices for a period of 30 days after arrival of the merchandise in U.S. port or to transit port if the ultimate destination is an interior distributing point.

\* \* \* \* \* \* \*

Plaintiff also called as a witness Sigurd Sater, president and general manager of Trondhjem Preserving Co., a New York corporation, and Emanuel H. Jacobsohn of Granadaisa Foods, Inc., importers of Norwegian sardines and kipper snacks. It appears that each of these witnesses had purchased such merchandise from at least five different Norwegian packers. These witnesses testified substantially as follows: That none of these packers required the above purchasers to purchase only from the particular packer (R. 8, 15); that such packers sold their merchandise to others, in addition to the witnesses above named (R. 8, 15); that none of such packers imposed any restrictions on the disposition or use of the Norwegian sardines and snacks so purchased (R. 8, 16); that the merchandise sold by these packers was paid for on sight (R. 8, 9) or after passing examination by the Pure Food & Drug department (R. 16); that such packers never required, as a condition of sale, payment for the goods at the time of shipment (R. 9, 16); that the packers never required, as a condition of sale, that the purchasers maintain warehouse facilities at a particular place (R. 9, 16–17); that these packers reimbursed the purchaser, if the price of sardines or kipper snacks was reduced within 30 days after arrival of the merchandise in the United States (R. 9, 17); that the packers did not require the purchaser to furnish product liability insurance, it appearing that the witness Sater was

reimbursed for product liability insurance which he purchased, while the witness Jacobsohn was not reimbursed for his purchase of such item (R. 9, 17); that, in the case of purchases made by the witness Sater, if there was a large quantity of spoiled or swelled cans, reimbursement has been made by the packer (R. 10), whereas the purchaser Jacobsohn had a guarantee of 30 days from the date of shipment in such cases (R. 17); that the purchase price could not be increased after the merchandise had been shipped (R. 10, 17); and that none of these packers had ever required the aforesaid purchasers to advance capital to the packer (R. 10, 17).

The defendant called as its witness Arthur G. Lange, connected with Chr. Bjelland & Co., Inc., of New York, who stated that he has been purchasing Norwegian sardines from Chr. Bjelland & Co. of Norway since 1945. He testified that his company purchased over 100,000 cases of 50 pack in 1959 and lesser amounts in 1957 and 1958, stating, in this connection, that the average export from Norway of all canned fish, based on 50 pack, would be in the neighborhood of 800,000 to 900,000 cases (R. 25). The witness further stated that he had, from time to time, specifically, in 1957, 1958, and 1959, paid more for the King Oscar brand merchandise than the prices paid by others for similar merchandise, exported from Norway, explaining, in this connection, that the firm in New York is owned solely by the company in Norway and that the former was required to pay whatever price was asked by the Norwegian concern, it further appearing that Mr. Lange's company was not permitted to purchase from any other Norwegian packer (R. 27). The record further discloses that, during the period involved in this case, all sales made by other Norwegian packers to the United States, almost without exception, were made at so-called minimum prices (R. 29).

On cross-examination, Mr. Lange testified that, at times, the prices paid by him to Bjelland of Norway in the purchase of kipper snacks were the same as the minimum prices; that, except for the latter part of 1958 up until the middle of 1959, when the exporter herein was in short supply of kipper snacks, the importer thereafter always paid the minimum prices (R. 30).

In the appeals at bar, the appraised values represent the actual selling prices of the involved merchandise and of merchandise identical in physical characteristics with, and produced in the same country by the same person as, the merchandise undergoing appraisement, as provided for in section 402(f)(4)(A) of the tariff act, as amended. The importer claims that the proper export values for the involved merchandise are represented by the prices at which sales or offers for sale of merchandise which is identical in physical characteristics with, "and was produced by another person in the same country as,

the merchandise undergoing appraisement," as provided for in section 402(f)(4)(B), *supra*. Concededly, export value is the proper basis of appraisement. Specifically, the importer contends (brief, page 12) :

Where merchandise described in Section 402(f)(4)(A) is not freely sold or in the absence of sales, offered for sale to all purchasers at wholesale (Sec. 402 (f)(1)(A)), consideration must be first given to other definitions of "such or similar" (Sec. 402(f)(4)(B) etc.) *before* resort may be had *to* restricted sales (Sec. 402(4)(1)(B)).

The Government, on the other hand, contends that "the merchandise undergoing appraisement is 'such * * * merchandise' as described in Section 402(f)(4)(A) ; was 'freely sold' within the statutory definition contained in Section 402(f)(1)(B) and that, therefore, consideration of whether a statutory export value of merchandise described in Section 402(f)(4)(B) exists is precluded unless a statutory export value for the merchandise undergoing appraisement cannot be determined." (Brief, page 3.)

The term "freely sold," as defined in section 402(f)(1)(B), expressly includes sales to selected purchasers and, in my opinion, the language of section 402(f)(4) requires reference to the statutory value of "such" merchandise, as defined in section 402(f)(4)(A), before reference can be made to the statutory value of "such or similar" merchandise, as defined in section 402(f)(4), (B), (C), or (D). In this connection, it appears pertinent to review the legislative history of section 402 of the tariff act, as amended by the Customs Simplification Act, *supra*.

In the Hearings before the Committee on Ways and Means, House of Representatives, 84th Congress, first session, on the Customs Simplification Act of 1955 (now 1956), H.R. 6040, May 23 and 24, 1955, in a memorandum submitted to the committee by the United States Tariff Commission, we find, at page 10 :

Subsection (b) of the proposed new version of section 402 of the tariff act is a definition of "export value" which follows substantially the definition of that method of valuation in the existing section 402(d) of the tariff act. The phrase in the present definition of "export value" "at which such or similar merchandise is freely offered for sale" is changed to read "at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale." * * * Thus, the proposed new language would not involve substantive changes in the valuation basis, but would merely make explicit in the statute that actual sales as well as offers for sale might be considered in determining dutiable value.

and, at pages 11–12 :

Subsection (f) of the proposed new version of section 402 is a new provision defining certain significant phrases used in the various definitions of valuation * * *. The first and second definitions can be treated together and are designed to overcome the controlled-market doctrine developed by the customs

courts, which has had the effect of precluding the use of the primary method of valuation in a great number of cases.  * * *

\*      \*      \*      \*      \*      \*      \*

The definition of "such or similar" merchandise in clause (4) will for the first time provide a specific and practical definition of this commonly used term, the lack of which has greatly impeded the smooth operation of the valuation law. * * *

In an analysis of the proposed Customs Simplification Act of 1955, submitted by the Treasury Department at the aforesaid hearings, I find relative to the proposed amendments to section 402 of the Tariff Act of 1930, at page 29, the following:

(5)  The appraiser may use actual sales instead of offers, where both exist, in determining export value or United States value.

(6)  A definition of "freely sold or offered for sale" is provided for the first time. It will permit determination of an export value, United States value, or American selling price on the basis of sales or offers to wholesalers which are unrestricted, * * *. It will also permit the use of sales to exclusive agents and other restricted sales where such limitations do not affect the price. * * *

Concededly, in the case at bar, "such" merchandise was sold "without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which * * * limit the price at which or the territory in which the merchandise may be resold, * * *" (section 402(f)(1)). The record discloses that there is no resale price restriction as to the involved merchandise and that the purchasers herein sell in certain territory of the United States. It would appear, therefore, that, for appraisement purposes, the merchandise in question was "freely sold," within the meaning of section 402(f)(1)(B).

In the House hearings, relative to H.R. 6040, 84th Congress, *supra*, page 12, with respect to the interpretation of the terms "such" and "similar," now appearing in section 402(f)(4) of the tariff act, as amended by the Customs Simplification Act of 1956, it was stated as follows:

* * * The *sequence* of *categories* provided *will make explicit* the present interpretation of the phrase to the effect *that recourse may be had* to *"similar" merchandise in making an appraisement only in the absence of "such"* (identical in physical characteristics) *merchandise*, and will add a requirement that merchandise produced by the same person be considered before merchandise produced by another person.  [Italics by the court.]

In my opinion, there is nothing in the present record which warrants a conclusion different from that found by the trial court in the *Chr. Bjelland & Co., Inc.*, case, *supra*, respecting the proper value attaching to merchandise such as is here involved.

The additional evidence adduced in this case, respecting the conditions recited in the affidavit of Mr. Omland (plaintiff's exhibit 2),

*supra*, and those stated herein by the witnesses for the plaintiff as to sales of similar merchandise by other exporters, has no effect upon the validity of the appraisement herein. While, apparently, these conditions are given so as to establish the ordinary course of trade between other Norwegian exporters of products such as here involved, they have no bearing on the transactions here between the exporter in question and the purchasers in this case, which transactions, in my opinion, are in the ordinary course of trade as affecting the brand of merchandise sold by the exporter here under consideration. As disclosed by the record, the established practice, with certain unusual exceptions, between the exporter in this case and the importer herein, as well as with the second purchaser, P. V. Bright & Co., was to sell King Oscar brand merchandise at prices higher than the selling prices of its export competitors. In this connection, plaintiff's witness Sater testified, on cross-examination, that he was familiar with the King Oscar brand merchandise shipped by the Bjelland company in Norway to Chr. Bjelland & Co., Inc., U.S.A., and P. V. Bright & Co. and stated that the prices paid by these latter companies were higher than those which he paid for merchandise of a similar kind, because the exporter had an "established brand," and a well-recognized brand in the United States (R. 10–12). To the same effect, was the testimony of plaintiff's witness Jacobsohn. In my opinion, the prices charged by the exporter herein are relevant in the determination of the value of the involved merchandise, since, under the statute, the conditions and practices in the trade in the sale of Norwegian canned fish products are those under which sales of these products are generally made, it further appearing in the record in this case that the sales made by the involved exporter during the periods herein involved constituted a substantial, if not the major, portion of the total quantity of brisling sardines and kipper snacks exported to the United States by the entire Norwegian canned fish products industry (R. 12, R. 19). The "ordinary course of trade," under the statutory definition, would include the sales made by the Bjelland company as well as those made by the other exporters.

On the record before me, I find as facts:

1. That the merchandise involved in these appeals for reappraisement consists of "King Oscar" brand brisling sardines in olive oil and "King Oscar" brand kipper snacks, packed in cans, and exported from Norway by the packer thereof during the period from March 8, 1958, to December 5, 1959, both dates inclusive, and sold to Chr. Bjelland & Co., Inc., of New York, its wholly owned subsidiary.

2. That said exporter also sold merchandise of the character here involved at the same prices as those made to the plaintiff herein to P. V. Bright & Co., Chicago, Ill., its only other purchaser in the United States.

3. That the sales to the said United States purchasers were freely made in the ordinary course of trade to one or more selected purchasers at wholesale at prices which fairly reflected the market value of the merchandise, as provided for in section 402(f)(1)(B), section 402(f)(2), and section 402(f)(4)(A) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

I conclude as matters of law:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended, *supra*, is the proper basis for appraisement of the involved merchandise.

2. That said export value is the appraised value in each case for each of the items herein involved.

Judgment will issue accordingly.