(A. R. D 161)

CHR. BJELLAND & CO., INC. v. UNITED STATES

Entry No. 700148, etc.

## Second Division, Appellate Term

(Decided November 13, 1963)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel) for the appellant.
*John W. Douglas*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the appellee.

Before LAWRENCE, RAO, and FORD, Judges

FORD, Judge: This is an application for review of the decision and judgment of the trial court, *Chr. Bjelland & Co., Inc.* v. *United States*, 48 Cust. Ct. 593, Reap. Dec. 10213, and covers appeals for reappraisement listed in schedule "A," attached hereto and made a part hereof, wherein it was held that the statutory export value is the appraised value for each of the items.

The merchandise involved herein consists of brisling sardines in olive oil and kipper snacks the same in all material respects as the merchandise before the court in *Chr. Bjelland & Co., Inc.* v. *United States*, 45 Cust. Ct. 435, Reap. Dec. 9753, which record is incorporated herein.

The merchandise was appraised on the basis of export value under the provisions of section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, Public Law 927 (70 Stat. 943), T.D. 54165, by reason of the fact that the merchandise in question was not specified in the final list, T.D. 54521, published by the Secretary of the Treasury, pursuant to section 6(a) of said Public Law 927.

The pertinent portions of section 402, Tariff Act of 1930, as amended, are as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings

of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*         \*         \*         \*         \*         \*         \*

(f)  DEFINITIONS.—For the purposes of this section—

(1)  The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A)  to all purchasers at wholesale, or

(B)  in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2)  The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\*         \*         \*         \*         \*         \*         \*

(4)  The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A)  The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B)  Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C)  Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D)  Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

The incorporated record in Reap. Dec. 9753, *supra*, consists of a stipulation entered into by and between counsel for the respective parties to the effect that the exporter sold at the same price to its only United States purchasers, Chr. Bjelland & Co., Inc., New York, N.Y., and P. V. Bright & Co. of Chicago, Ill., in the usual wholesale quantities or higher and in the ordinary course of trade, for export to the United States, and that such or similar merchandise, as defined in section 402(f)(4)(A) of the Customs Simplification Act of 1956,

was not sold or freely offered for sale during the involved period to any other United States purchaser; that if the court finds export value under section 402(b), as amended, *supra*, as defined in section 402(f) (4) (A), then the appraised values represent the dutiable values of the merchandise in each case, since the merchandise is not on the final list of products promulgated in T.D. 54521. In addition to the foregoing stipulation, an affidavit of the president and chairman of the board of exporters was received in evidence as plaintiff's exhibit 1 and sets forth the following terms, conditions, and practices under which the exporter did business with its two United States purchasers, i.e., that P. V. Bright & Co., since February 10, 1909, has purchased King Oscar brand sardines and kippered herring from the affiant's company and is granted the exclusive right to sell in 14 States; that it is a condition of doing business that Bright & Co. will not buy, sell, or deal in any way with, sardines or kippered herring sold by any other Norwegian or Swedish canners; that Bright & Co. is required to advance at the beginning of the packing season as much money as the affiant's company estimates it will require and that such advances have amounted to as much as $100,000; that both Bright & Co. and Bjelland & Co. are required to defray some or all of the advertising costs in the United States; that the percentage of the cost to be borne by each company is determined by affiant's company in its sole discretion; that Bjelland & Co. of New York is a wholly owned subsidiary; that said subsidiary is not permitted to purchase sardines or kippered herring from any other packer and is permitted to offer this merchandise in the 34 States and the District of Columbia, wherein Bright & Co. may not make sales.

Affiant, in his affidavit, further states that the importers in the United States are required to pay for merchandise at the time of shipment; that they are required to maintain warehouse facilities at various places within their respective territories to enable them to make spot deliveries when required; that they must guarantee customers' floor stocks against price declines without any reimbursement from his company; that they must purchase and pay for product liability insurance and replace or make allowance for swelled or spoiled cans up to 6 months after receipt by the purchaser; that the merchandise is not sold or offered for sale for exportation to the United States to other than the two above-named companies; that the prices at which sales are made are determined by his company in its discretion and are partly based on his company's supplies and anticipated demands; that the prices are never subject to negotiation; that the quantities and prices are never firm for exportation to the United States and are sometimes changed after the merchandise had been exported from Norway.

Based upon his experience of over 26 years, all of which was directly concerned with the canning and selling of sardines and other products, the affiant made the following statement:

\* \* \* I know that no other packer or exporter in Norway follows the same policies that my company follows. Other Norwegian packers or exporters of fish and fish products identical or similar in physical characteristics with those produced by my company who sells for exportation to the United States are: Atlantic Canning Co. A/S, Central Canning Co. A/S, A/S Herkules Canning Co., Mercantile Canning Co. A/S, Mogens Canning Co. A/S, Norrig Hermetikkfabrikker A/S, North Sea Packing Co. Ltd., A/S Standard Ltd., Stavanger Canning Co. A/S, Stavanger-Fjord Packing Ltd., Stavanger Packing Co. A/S, Stavanger Preserving Co. A/S, Bergen Preserving Co. A/S, A/S Bergenhus Canning Co., Norwegian Preserving Co. A/S, A/S Trondhjem Canning & Export Co. All of the foregoing packers and exporters freely offer and sell their products to any one who wishes to purchase them for exportation to the United States without restrictions of any sort and their prices do not vary by reason of the quantities purchased. The prices at which they offer and sell Norwegian canned fish and fish products, identical in physical characteristics with the fish and the fish products produced by my company, for exportation to the United States fairly reflect the true market value as a result of arms' length transactions between unrelated persons in the open market. These prices are indicated for the various competing types and sizes of sardines and kippered herring, as noted on the attached schedules together with the prices charged by my company for merchandise having identical or similar physical characteristics.

The record, as made below, consists of an affidavit of Olav Omland, secretary general of the Export Committee for Norwegian Canned Fish Products, received in evidence as plaintiff's exhibit 2, which states as follows:

1) Sales of canned fish are primarily made from Norwegian canning factories and exporters direct to importers in the U.S.A.—to a lesser extent through U.S. agents.

The general routine is that offers giving details of prices, payment and delivery terms are submitted to the U.S. buyers and must be accepted by them before a sale can be concluded. It is not usual that the sales contract stipulates any conditions as regards the buyer's re-sale of the merchandise. It is also extremely seldom that the seller makes any sale conditional of any obligation on the part of the buyer to confine his purchases of such merchandise to the seller, or to carry a minimum stock at any time.

2) The usual Norwegian sales terms are Net FOB or CIF U.S. sea port.

3) The usual payment terms are Cash Against Documents on arrival of the merchandise at American port.

4) It is usual that the Norwegian seller gives a guarantee against decline in prices for a period of 30 days after arrival of the merchandise in U.S. port or to transit port if the ultimate destination is an interior distributing point.

5) If the American buyer carries a Products Liability Insurance, it is customary that the Norwegian seller gives a 0.3% price refund to the buyer.

6) Only few Norwegian canning factories and exporters have advertised their products in the U.S.A. Such brand advertising is entirely at the Norwegian brand owners expense.

Two witnesses representing two firms whose business is the importation of Norwegian sardines and kipper snacks were called to testify on behalf of plaintiff herein.   It appears that each of these witnesses had purchased Norwegian sardines and kipper snacks from at least five different Norwegian packers.   The witnesses testified as to the manner of doing business with the Norwegian exporters.   They basically testified that none of the packers required them to purchase only their merchandise; that such packers sold their merchandise to others; that none of the packers imposed any restrictions on the disposition or use of the merchandise purchased; that the merchandise sold to them was paid for on sight or after passing examination by the Pure Food and Drug Administration; that the packers never required payment for the goods at the time of shipment, nor were they required to maintain warehouse facilities at a particular place; that the packers reimbursed the purchasers, if the price of the merchandise was reduced within 30 days after arrival; that the packers did not require the importers to furnish liability insurance, although one witness stated his firm was reimbursed by the packer when the insurance was purchased, while the firm of the other witness was not so reimbursed; that, in the case of purchases made by one of the witnesses, if there was a large quantity of swelled or spoiled cans, reimbursement was made by the packer, whereas the other witness had a guarantee of 30 days from the date of shipment in such cases; that the purchase price could not be increased after the merchandise had been shipped; that none of the packers required the purchasers to advance capital to the packers.

The witnesses were also of the opinion that Bjelland of Norway charged higher prices for its merchandise, because it was an established well-recognized brand in the United States.   The witnesses testified that they purchased their merchandise at minimum prices, except when in short supply, which has not been the case in the last 2 or 3 years.   Both witnesses believed that Bjelland of Norway shipped more to the United States than all other packers combined.

The defendant called on its behalf Arthur G. Lange, connected with Chr. Bjelland & Co., Inc., of New York, who testified that he has been purchasing Norwegian sardines from Bjelland & Co. of Norway since 1945; that his company has purchased over 100,000 cases of 50 pack in 1959 and lesser amounts in 1957 and 1958; that, in his opinion, the average export from Norway of all canned fish, based on 50 pack, would be in the neighborhood of 800,000 to 900,000 cases; that he believed that his firm is the largest single importer of kipper snacks and brisling sardines; that his firm is solely owned by Bjelland & Co. of Norway and is required to pay the price demanded by it, since his company is not permitted to purchase from any other packer.

Based upon this record, the trial court found the appraised value to be the correct dutiable value of the merchandise involved herein and

stated that the additional evidence adduced in this case, which attempted to establish that the manner of doing business of Bjelland & Co. of Norway was not in the ordinary course of trade, had no effect on the validity of the appraisement. The trial court concluded that the ordinary course of trade under statutory definitions would include the sales made by Bjelland & Co. of Norway, as well as those made by other exporters. This is particularly true, since Bjelland & Co. of Norway exported a substantial, if not major, portion of the total quantity of brisling sardines and kipper snacks to the United States.

Appellant contends that the trial court erred in finding that the manner of doing business by Bjelland & Co. of Norway was the ordinary course of trade, since that phrase, under the definition set forth in section 402(f)(2) relates to merchandise of the same "class or kind," thereby broadening the scope of the phrase. *Star-Kist Foods, Inc.* v. *United States et al.*, 45 CCPA 16, C.A.D. 666.

In Reap. Dec. 9753, incorporated herein, *supra*, the late Judge Mollison, in commenting on the term "ordinary course of trade," made the following statement:

I am satisfied, therefore, that, in its application to the facts in the case at bar, the term "ordinary course of trade" refers to the trade in the sale of Norwegian canned fish products for exportation to the United States generally, and is not limited to the trade in the canned fish products of the seller of the merchandise at bar.

In the case at bar, the trial court made the following comment:

* * * In my opinion, the prices charged by the exporter herein are relevant in the determination of the value of the involved merchandise, since, under the statute, the conditions and practices in the trade in the sale of Norwegian canned fish products are those under which sales of these products are generally made, it further appearing in the record in this case that the sales made by the involved exporter during the periods herein involved constituted a substantial, if not the major, portion of the total quantity of brisling sardines and kipper snacks exported to the United States by the entire Norwegian canned fish products industry (R. 12, R. 19). The "ordinary course of trade," under the statutory definition, would include the sales made by the Bjelland company as well as those made by the other exporters.

We do not see any conflict between the expressions cited, *supra*, as does appellant herein. We are of the opinion that there may well be instances wherein there is more than one manner of doing business which would constitute the "ordinary course of trade." This is particularly so in an instance such as is involved herein, where the exporter is accountable for a substantial, if not major, portion of the sales to the United States of brisling sardines and kipper snacks. There appears to be some contradictory evidence of this fact. The testimony of Mr. Lange, who was of the opinion that the total exportation of 50 pack of all canned Norwegian fish would run between 800,000 and

900,000 cases, differs from the opinion of the other witnesses who were of the opinion that Bjelland of Norway exported more brisling sardines and kipper snacks than all the other packers combined. A careful analysis establishes that Mr. Lange's testimony related to more than brisling sardines and kipper snacks. Further evidence of Mr. Lange that his firm, Bjelland & Co. of New York, was the largest single importer of those items tends to corroborate this fact.

While it ordinarily may be true that the entire industry would do business in the same manner, it is also conceivable that various segments of a particular industry may deal under different conditions. Where this is so, any substantial manner of doing business would be the "ordinary course of trade" within the definition, particularly so where, as here, the conditions and provisions have been in existence for so long a period of time. This appears to be the intent in enacting the amendments to section 402 involved herein, which set forth the definition in subsection (f). In the hearings before the Committee on Ways and Means, House of Representatives, 84th Congress, first session, on H.R. 6040, May 23 and 24, 1955, in a memorandum submitted by the United States Tariff Commission, the following statement was made:

Subsection (f) of the proposed new version of section 402 is a new provision defining certain significant phrases used in the various definitions of valuation which have been the subject of a century of litigation. The first and second definitions can be treated together and are designed to overcome the controlled-market doctrine developed by the customs courts, which has had the effect of precluding the use of the primary method of valuation in a great number of cases. As interpreted by the courts, our valuation laws have failed to keep abreast of the developments of modern commerce. It was held that the terms "freely offered for sale" and "ordinary course of trade" preclude the consideration of sales and offers for sale which were accompanied by various restrictions on the use or disposition of the goods undergoing sale. The definitions in clauses (1) and (2) of subsection (f) recognize accepted modern-day conditions and practices in commerce and will greatly increase the opportunity for use of the primary method of valuation in determining dutiable value of imported merchandise.

The memorandum submitted by the Tariff Commission and cited, *supra*, in the hearings before the Committee on Ways and Means in the House of Representatives, confirms our position that the amendment to section 402 and the definition set forth in subsection (f) were for the purpose of recognizing the accepted modern-day conditions and practices in commerce. Since this is new law, there are no cases which have held that there may be more than one "ordinary course of trade." We, however, believe that, under certain circumstances and as a result of modern-day conditions and practices in commerce, such may occur.

Appellant also contends the merchandise is not "freely sold." Under the definition set forth in section 402(f) (1) (B), the trial court reviewed this phase and made the following comment:

The term "freely sold," as defined in section 402(f) (1) (B), expressly includes sales to selected purchasers and, in my opinion, the language of section 402(f) (4) requires reference to the statutory value of "such" merchandise, as defined in section 402(f) (4) (A), before reference can be made to the statutory value of "such or similar" merchandise, as defined in section 402(f) (4), (B), (C), or (D). In this connection, it appears pertinent to review the legislative history of section 402 of the tariff act, as amended by the Customs Simplification Act, *supra*.

In the Hearings before the Committee on Ways and Means, House of Representatives, 84th Congress, first session, on the Customs Simplification Act of 1955 (now 1956), H.R. 6040, May 23 and 24, 1955, in a memorandum submitted to the committee by the United States Tariff Commission, we find, at page 10:

Subsection (b) of the proposed new version of section 402 of the tariff act is a definition of "export value" which follows substantially the definition of that method of valuation in the existing section 402(d) of the tariff act. The phrase in the present definition of "export value" "at which such or similar merchandise is  freely offered for sale" is changed to read "at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale." * * * Thus, the proposed new language would not involve substantive changes in the valuation basis, but would merely make explicit in the statute that actual sales as well as offers for sale might be considered in determining dutiable value.

\*      \*      \*      \*      \*      \*      \*

In an analysis of the proposed Customs Simplification Act of 1955, submitted by the Treasury Department at the aforesaid hearings, I find relative to the proposed amendments to section 402 of the Tariff Act of 1930, at page 29, the following:

(5)   The appraiser may use actual sales instead of offers, where both exist, in determining export value or United States value.

(6)   A definition of "freely sold or offered for sale" is provided for the first time. It will permit determination of an export value, United States value, or American selling price on the basis of sales or offers to wholesalers which are unrestricted, * * *. It will also permit the use of sales to exclusive agents and other restricted sales where such limitations do not affect the price. * * *

Concededly, in the case at bar, "such" merchandise was sold "without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which * * * limit the price at which or the territory in which the merchandise may be resold, * * *" (section 402(f) (1)). The record discloses that there is no resale price restriction as to the involved merchandise and that the purchasers herein sell in certain territory of the United States. It would appear, therefore, that, for appraisement purposes, the merchandise in question was "freely sold," within the meaning of section 402(f) (1) (B).

It is also contended by appellant that, in order to conform with the statutory provisions, the merchandise must fairly reflect the market value which appellant herein believes is not so. The record herein

establishes that King Oscar brand is a well-recognized, established product in the United States, which enables it to demand a higher price than some competitive products. The fact that a well-recognized brand can demand a higher price is not unique as to imports; it is fairly common in the domestic products of the United States, such as various brands of coffee, canned food products, etc.

We are of the opinion that the invoiced prices do fairly reflect the market value of King Oscar brisling sardines and kipper snacks.

Upon the foregoing considerations, we make the following findings of fact:

1. That the merchandise involved in these appeals for reappraisement consists of "King Oscar" brand brisling sardines in olive oil and "King Oscar" brand kipper snacks, packed in cans, and exported from Norway by the packer thereof during the period from March 8, 1958, to December 5, 1959, both dates inclusive, and sold to Chr. Bjelland & Co., Inc., of New York, its wholly owned subsidiary.

2. That said exporter also sold merchandise of the character here involved at the same prices as those made to the plaintiff herein to P. V. Bright & Co., Chicago, Ill., its only other purchaser in the United States.

3. That the sales to the said United States purchasers were freely made in the ordinary course of trade to one or more selected purchasers at wholesale at prices which fairly reflected the market value of the merchandise, as provided for in section 402(f)(1)(B), section 402(f)(2), and section 402(f)(4)(A) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

The court, therefore, concludes as matters of law:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended, *supra*, is the proper basis for appraisement of the involved merchandise.

2. That said export value is the appraised value in each case for each of the items herein involved.

The decision and judgment of the trial court are, therefore, affirmed. Judgment will be rendered accordingly.