(Reap. Dec. 10788)

Page & Jones, Inc.
Charles A. Sayous, Inc. } *v.* United States

Entry Nos. 222; 5290.

(Decided July 6, 1964)

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* of counsel) for the plaintiffs.

*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

Donlon, Judge: The merchandise of these two appeals, which were consolidated for purposes of trial, is canned corned beef that was packaged in 12-ounce tins under the "Bravo" label, with 24 tins to the case, and exported from Uruguay by Frigorifico Nacional of Montevideo. Charles A. Sayous, Inc., was the purchaser and importer. Page & Jones, Inc., is the customs broker servicing the importation. The invoice of R61/19761 refers to the merchandise as second grade; the invoice of R61/12514 does not mention grade; but the parties appear to concede that this, too, was second-grade beef.

The merchandise was exported, entered, and appraised as follows:

| Reappraisement number | Date of exportation | Invoiced and entered | Appraised |
|---|---|---|---|
| R61/19761 | 3/27/59 | $5.125 per case (24 tins) | $2.875 per dozen tins |
| R61/12514 | 9/29/58 | $5.125 per case (24 tins) | $2.83 per dozen tins |

This merchandise is not an article enumerated in the final list of the Secretary of the Treasury (T.D. 54521), and it was appraised

on the basis of export value, under section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Plaintiffs concede that appraisement at export value is correct, but contend that such value is the invoice price in each appeal, as recited above.

On trial, plaintiffs introduced into evidence an affidavit of Hugo J. Stagnaro, representing himself to be head of the export department of Frigorifico Nacional de Montevideo, verified April 29, 1963. (Plaintiffs' exhibit 1.) His affidavit states that, during 1958 and 1959, Frigorifico Nacional sold packed meat products to customers in the United States as follows:

a) Our leading customers, such as Charles A. Sayous, Inc. and Louis Furth, Inc. placed contracts with us for large quantities of merchandise to be produced during a future period, for a price agreed upon. During the life of our contract, our purchaser from time to time sent out shipping instructions to ship a certain amount of merchandise at the contract price for a specified destination in the United States.

b) Our smaller customers in the United States such as Granger & Co., Alan Levin Jr., Rico Products, Inc. did not place long term contracts with us, but instead made a series of purchases separately in much smaller amounts. Such orders were executed with merchandise already produced and on hand. Such sales of merchandise already manufactured and in stock are mentioned in these presents as "spot" sales.

The affidavit further recites that Frigorifico Nacional did not publish pricelists; that prices of its products for export were determined by negotiation with each purchaser. Leading customers, purchasing at contract prices in large quantities, got better prices than did those customers who bought smaller quantities of what Mr. Stagnaro called "spot" merchandise. Merchandise was offered on terms, either, FOB Montevideo, or C & F, or CIF.

According to Mr. Stagnaro, the commercial name or label is important in the trade in packed meat products. Certain customers, such as Charles A. Sayous, Inc., and Louis Furth, Inc., have their own labels and merchandise sold to them is packed under their labels. Charles A. Sayous, Inc., owned the label "Bravo," but also was granted the labels "Holly" and "Altion." Louis Furth owned the label "Preferito" and also was granted the label "Favorito." Frigorifico Nacional owned the brands "Frigonal" and "National," and these were used to label meat sold to other customers.

Attached to Mr. Stagnaro's affidavit are two lists of sales. One shows sales of *first grade* corned beef during 1958–59, and the other shows sales of *second grade* corned beef during the same years.

In a second affidavit, verified May 22, 1963 (plaintiffs' exhibit 2), Mr. Stagnaro affirmed that, insofar as he was aware, the sales practices of Frigorifico Nacional were among the normal methods and practices in the trade in Uruguayan prepared meats, and that they were in

all essential respects similar to the export sales methods and practices of South American meat packers generally.

The same lists of sales, with the insertion of brand names in the column marked "Label," were attached to this second affidavit.

Mr. Charles A. Sayous, president of Charles A. Sayous, Inc., testified that he purchased canned meat from Frigorifico Nacional in 1958 and 1959, placing a contract against which merchandise later was shipped. He negotiated the purchase price, which was $5.125 per case for "Bravo" brand, 12-ounce tins, packed 24 tins to the case. He said that this was his purchase price throughout the year 1958, and up to and including March 27, 1959. Merchandise was not available for immediate delivery, but was produced thereafter.

Mr. Sayous testified that, since 1955, his firm had purchased canned meat products from South America, from seven sources in four countries, with a total worth of 35 million dollars. Based on his experience, he said that purchases for delivery against long-term contracts were ordinary and normal in the trade in those countries for the big buyers.

Mr. Sayous said that, on March 9, 1959, he "bought" for future delivery 15,000 cases of "Bravo" brand, second-grade corned beef, at a price of $5.75 per case, 12-ounce tins, packed 24 tins to a case. This was the same merchandise that he had earlier bought for $5.125 per case. He did not know whether, on or about March 27, 1959, he had had a cable from Frigorifico de Montevideo that shipments at the higher price of $5.75 per case had then commenced.

Mr. Sayous testified that he regards the label as part of the article when he buys canned meats; that he is the owner of the "Bravo" label, a label which is registered in this country. Although he also purchased "Holly" brand meats, as well as "Bravo" brand, from Frigorifico Nacional and at the same price, $5.125 per case, and although it was identical merchandise, except for the label, he wanted to sell his own brand because it had greater sales appeal *for him*. He did not buy the "Holly" brand in the same way, because he did not own that label. However, when he bought from Frigorifico Nacional, he had the right to tell them to pack so many cases of "Bravo" brand and so many cases of "Holly" brand. He did not buy the "Holly" brand exclusively under a long-term contract, but did buy the "Bravo" brand under such a contract. He said that when he contracted for the purchase of the "Bravo" brand with any of his sources in South America, he would not have accepted any other label as a good delivery.

Mr. Alfred Schafer, sales manager of Louis Furth, Inc., testified that he had done business with Frigorifico Nacional for many years. He identified a document as a contract which his firm made with Frigorifico Nacional, in April 1958, covering purchase of "Favorito"

brand corned beef, for future shipment, at $5.25 a carton of 24 tins, 12 ounces each, or $10.50 for 48 such tins. Mr. Schafer said he was familiar with the quality of Mr. Sayous' corned beef, and that it was of the same kind and class as the merchandise which his firm imported. On or about March 27, 1959, Louis Furth was still receiving shipments at its 1958 contract price, viz, $5.25.

The witness testified that he had been in the canned meat trade since 1950, and that, during that time, he had purchased about 5½ million dollars worth of merchandise from five supplier sources in two countries of South America. Based on his experience, it was his opinion that purchases against long-term contracts were the ordinary and usual practices in the canned meat trade of South America, and that the Louis Furth contract was an ordinary commercial transaction.

He regarded the label as an important part of the commodity, on the ground that when a dealer has an exclusive arrangement for a label, or owns his own label, he can guarantee it to his customer. He pointed out that many sales angles can be used when the seller has one label at all times, whereas if he has four or five different labels, the customer cannot sell on the basis of a continuous business. The label, he said, is regarded as important in the trade. The contract (plaintiffs' exhibit 4), granted Louis Furth the exclusive use of the "Favorito" label for 1 year from its date, April 29, 1958. The witness said he tried to protect a label by purchasing only where he has an exclusive arrangement for it or can have the merchandise packed under his own private label.

A series of cables, together with a letter, dated December 17, 1957, from Mr. E. Roge, Sayous' agent in Montevideo, confirmed that Sayous' offer to purchase 80,000 cases of "Bravo" brand corned beef at $5.125, had been accepted. (Plaintiffs' collective exhibit 5.) Plaintiffs' collective exhibit 6 and exhibit 7 are a further series of cables in which Frigorifico offered up to 15,000 cases of corned beef, second grade, for $5.75; Sayous counteroffered to buy 50,000 cases at that price; this offer was not accepted; and then Sayous accepted the original offer of 15,000 cases at $5.75.

Plaintiffs claim that "Bravo" brand corned beef, and only "Bravo" brand, is *such* merchandise as section 402 (f) (4) (A) contemplates; that "Bravo" brand corned beef was freely sold to one selected purchaser, in the ordinary course of trade, at a price which fairly reflects the market value of the merchandise; and that such price is the entered value in each of these appeals.

Defendant argues that identical second-grade canned corned beef sold by Frigorifico Nacional de Montevideo conforms to the statutory definition as *such* merchandise. Defendant also contends that the ordinary course of trade was to sell to all purchasers, not merely to

one selected buyer, and that, at or about the time of exportation, there were sales in the ordinary course of trade at prices equal to the appraised values.

The gist of plaintiffs' argument is that *such* merchandise is limited to the "Bravo" brand and that defendant may not include merchandise conceded to be identical, but imported under another brand name or names, as *such* merchandise.

There is, of course, judicial authority for the proposition that only merchandise marketed under a trade name or label may be, in certain circumstances, *such* merchandise to the exclusion of other brands of identical merchandise; but that rule appears to have been limited, thus far at least, to cases where the record showed that the brand, or label, gave to the merchandise a distinct value in the trade or commerce of the United States. *Chr. Bjelland & Co., Inc.* v. *United States*, 51 Cust. Ct. 520, A.R.D. 161, appeal pending in Court of Customs and Patent Appeals (appeal 5164); *United States* v. *Marine Products Co.*, 24 Cust. Ct. 615, Reap. Dec. 7830, affirmed *sub nom Marine Products Co.* v. *United States*, 39 CCPA 52, C.A.D. 462.

In *Chr. Bjelland & Co., Inc.* v. *United States, supra*, now on appeal (therefore, the issue is not yet definitely settled), sardines and kipper snacks, packed under the "King Oscar" brand, were appraised on the basis of export value under section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act, the same provision pertinent here, at prices for sales of that brand to two selected purchasers in the United States. The appellate term, in its opinion, said:

* * * The record herein establishes that King Oscar brand is a well-recognized, established product in the United States, which enables it to demand a higher price than some competitive products. The fact that a well-recognized brand can demand a higher price is not unique as to imports; it is fairly common in the domestic products of the United States, such as various brands of coffee, canned food products, etc. [P. 528.]

In *United States* v. *Marine Products Co., supra*, the basis was United States value, under the old law, and the court said:

All of the Mexican canned tuna fish sold in the United States during 1942 was imported by Marine Products Co., the importer of the present merchandise. Because of heavy sales resistance to Mexican canned tuna fish in this country, with consequent financial loss in sales promotion, the shipments were imported unlabeled and sold by the importer in the same condition. The merchandise was not freely offered, but was sold, under the terms of a verbal agreement to one purchaser, Westgate Sea Products Co., who used its own label because its consumer value was higher than any other label.

* * * Furthermore, the price at which the single purchaser ultimately sold its merchandise in the United States market was not the value of the imported product *per se*, but rather the "good will" application of a recognized commercial label, which was attached after importation and subsequent to the disposition of the merchandise by the importer to the exclusive purchaser. The imported shipments consisted of unlabeled cans of tuna fish. Using a label that made the

commodity a commercially profitable article, had the effect of changing its condition from the time of importation. \* \* \* [P. 625.]

In both these cases, the record showed that there was commercial difference based on the label of freely offered brands.

Where the imported products were of well-known brands which brought higher prices by reason of reputation, but those brands were not freely offered for sale at the time of exportation, appraisement on the market value of *similar* merchandise has been supported, under the old law. *United States* v. *Briones & Co., Inc.*, 22 CCPA 245, T.D. 47158; *United States* v. *The American Bluefriesveem, Inc.* (*Van Houten Co.*), 22 CCPA 67, T.D. 47063.

However, in *R. J. Saunders & Co., Inc.* (*Perry H. Chipurnoi, Inc.*) v. *United States*, 42 CCPA 55, C.A.D. 570, where there was nothing to indicate that the brand was widely known, or that it had any special commercial value, the court said:

As the manufacturer had expressly reserved the right to sell the same merchandise under labels other than "Sans-O," and did, as established, so sell for exportation to the United States, we do not think that it necessarily follows that because the importer was unable to procure labels, as stated, that the *same* merchandise was not freely offered for sale thereto. \* \* \* [Pp. 60–61; emphasis supplied.]

The principle is stated succinctly in a pamphlet, issued by the Bureau of Customs on December 12, 1956, for the purpose of explaining the Customs Simplification Act of 1956. After discussing categories A and B, of section 402 (f) (4), *supra*, relating to identical merchandise, it is said:

Whether identical merchandise marketed under a trade name or label comes within this category would depend on the commercial value of the trade name or label. [P. 5.]

Obviously, interpretation by the Bureau is not binding on the court. Here it does appear to accord with settled judicial precedents.

The issue then, is whether the record establishes that the "Bravo" brand, or label, had a commercial value that set it apart from other brands of identical merchandise. Mr. Sayous testified that he owned the "Bravo" label, but that he also purchased the "Holly" brand for the same price. His examination on this subject is revealing:

Q. Well, in your experience, is there anything different between Holly and Bravo, between the Holly brand and the Bravo brand at all?—A. In quality?

Q. Yes.—A. No.

Q. In sales appeal?—A. Yes.

Q. Will you tell us what that is?—A. The reason is Bravo is my own brand——

Q. No. What is the difference in the sales appeal between Holly and Bravo?—A. The difference is Bravo is my own brand. I push Bravo brand.

Q. Well, is that sales appeal for you, or sales appeal for the purchaser?—A. No ; sales appeal for me. [R. 38, 39.]

Mr. Sayous added that he would not have accepted any other label as good delivery, because he wanted to sell his own label. (R. 41.) (He apparently did accept some of the "Holly" brand when he purchased from Frigorifico Nacional.) He testified:

* * * When I buy from Frigorifico Nacional, I got the right to tell Frigorifico Nacional to pack so many cases of Bravo brand, and so many cases of Holly Brand. * * *

\* \* \* \* \* \* \* \*

* * * But you understand I got the right to tell Frigorifico Nacional to pack so many cases with the Holly label, but Holly label is 1 to 10 against the Bravo label. [R. 42, 43.]

Although Mr. Sayous testified that the second contract, or agreement, which he negotiated in March 1959, was for "Bravo" brand corned beef, the cables evidencing this agreement (plaintiffs' collective exhibit 6 and exhibit 7) do not mention any label, and the list attached to Mr. Stagnaro's affidavit (plaintiffs' exhibit 2) shows "Holly" brand beef in the listing of that sale.

There is no evidence before me either that "Bravo" beef commanded a higher price in the commerce and trade of the United States, or that it had any special reputation, by reason of the label, or that "Bravo" is a brand that had commercial recognition save by Sayous himself. There is nothing to indicate that it was well known or esteemed by consumers. The label was, at most, important to the importer, as a brand he owned and could profitably push. While Mr. Schafer testified that labels are important, because of the sales angle, there is no evidence that "Bravo" brand was extensively advertised or that sales appeal with consumers had been built up.

On this record, I am of opinion that *such* merchandise is not limited to the "Bravo" brand, to the exclusion of other freely offered brands of identical canned corned beef.

Having found that the label is not sufficient to set apart the "Bravo" brand, it seems clear that all of the canned corned beef, second grade, that was sold by Frigorifico Nacional de Montevideo for export to the United States, conforms to the merchandise definition in section 402(f)(4)(A):

The merchandise undergoing appraisement and other merchandise *which is identical in physical characteristics* with, and was produced in the same country by the same person as, the merchandise undergoing appraisement. [Emphasis added.]

Such merchandise was, then, freely offered for sale by the manufacturer to all purchasers; but the price in each instance, whether the sale involved a large or small quantity, or a "spot" sale or a contract of sale, was determined by negotiation. An examination of the list of sales during 1958 and 1959 discloses that price did not vary with quantity, or that purchasers of large quantities necessarily bought at

lower prices. The prices varied with the purchaser. There were rising prices on sales during the period here in issue.

As shown on the list of sales annexed to exhibits 1 and 2, the sales by Frigorifico nearest in time to the date of exportation of the merchandise of R61/12514, September 29, 1958, were a month earlier, on August 28 and 30, 1958. The former was a sale to Oceanic Trading Co., at $5.70 C & F ($5.115 FOB) for 200 cases; the latter was to Y. Hata Co., at $6.25 C & F ($5.62 FOB) for 700 cases. The latter is approximately the price at which 2,500 cases imported on September 29, 1958, were appraised.

As shown by the same list, sales by Frigorifico nearest to the date of exportation of the merchandise of R61/19761, March 27, 1959, were those of March 13 and 20, 1959. (It is noted that Mr. Stagnaro lists a sale on March 20; but Mr. Sayous testified that this was March 9.) The former also was a sale to Oceanic Trading Co., at $5.95 C & F ($5.31 FOB) for 100 cases; the latter was a sale of 15,000 cases to Sayous at $5.75 FOB. Appraisement of 1,000 cases in R61/19761 was based on the March 9 (or 20?) sale to Sayous. Plaintiffs argue that this was not, in fact, a sale; that it was merely an order for future delivery and, therefore, is not within the scope of the section 402(b)(4) provision as to export value, which bases export price on the price at which merchandise *is freely sold* at the time of exportation. As to this, Mr. Sayous testified:

A. Yes. I bought, in March 9, 1959, 15,000 cases 24–12 at $5.75 a case.

MR. BRAVERMAN: If your Honor please, I'd like to have it noted that the witness says that he bought on March 9th 15,000 cases.

JUDGE DONLON: Was it bought, or ordered? Would you repeat the exact word that you used?

THE WITNESS: Yes; I bought, I confirmed to Frigorifico Nacional 15,000 cases at $5.75, for delivery in 1959.

Q. Of merchandise to be delivered subsequently?—A. Yes, sir. [R. 28.]

Furthermore, the witness was unable to state definitely whether he was receiving deliveries, under the agreement of March 9, 1957, on March 27, the date of exportation. (R. 29, 30, 40.)

Inasmuch as, on the record before me, plaintiffs have not overcome the presumption that *such* merchandise includes identical merchandise packaged under other brand labels than "Bravo" and exported from Uruguay by the exporter of this merchandise, it is neither necessary nor advisable to discuss the arguments as to the marketing conditions of "Bravo," and whether or not they meet the standards which Congress has established in section 402(b) for sales to selected customers. Interesting as those arguments are, on both sides, they are not basic to the situation disclosed in the record before me. Discussion here would be mere *dicta*, in view of my holding as to what, on this record, *such* merchandise includes.

It is well settled that, in reappraisement cases, plaintiffs have the burden of proving not only that appraised value is erroneous, but also of establishing some other value as the correct dutiable value of the merchandise. *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593; *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502; *G. & H. Transport Co., Inc. (Philipp Wirth)* v. *United States*, 27 CCPA 159, C.A.D. 78.

Plaintiffs here have not sustained this double burden. It may be that the appraised values are erroneous, since it appears that price depended upon the bargaining ability of purchasers and that there was no one price at which the merchandise was freely sold to all purchasers. This might seem to say that there is no basis for export value as the basis of appraisement. *United States* v. *Kellogg Co.*, 19 Cust. Ct. 330, Reap. Dec. 7456; *United States* v. *M. Minkus*, 21 CCPA 382, T.D. 46912; *United States* v. *The Heyman Co., Inc.*, 50 Cust. Ct. 564, A.R.D. 157. Plaintiffs have not, however, established some other basis of value for this merchandise. Indeed, they have conceded that the appraiser's finding that there is export value is correct.

The values found by the appraiser have not been disproved. *United States* v. *Vandergrift Forwarding Co., Inc.*, 42 Cust. Ct. 687, A.R.D. 96.

On the record before me, I find as facts:

1. That the merchandise, subject of these appeals, is canned corned beef, second grade, packed in 12-ounce tins under the "Bravo" label, or brand, 24 tins per case, sold by Frigorifico Nacional de Montevideo, Uruguay, and exported from Uruguay on September 29, 1958 (R61/12514), and on March 27, 1959 (R61/19761).

2. That this merchandise is not an article enumerated in the final list under the Customs Simplification Act of 1956. (T.D. 54521.)

3. That the merchandise was appraised on the basis of export value, under section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. That canned corned beef with the "Bravo" label was sold only to Charles A. Sayous, Inc., who owned the brand "Bravo"; but that identical merchandise, packed under other labels, produced in the same country and by the same producer, was freely sold to all purchasers for export to the United States at or about the times of the instant exportations.

5. That the "Bravo" label did not have special commercial value; that there is no evidence that canned corned beef, with the "Bravo" label, was well known or specially esteemed by consumers, nor that it was highly advertised so as to build up market demand for it.

6. That the prices for canned corned beef, second grade, produced by Frigorifico Nacional de Montevideo, during 1958 and 1959, varied

with the purchaser, and there were several price increases during those years.

I conclude as matters of law:

1. That *such* merchandise is not limited to canned corned beef, packed under the "Bravo" label, to the exclusion of other merchandise identical, except for label.

2. That plaintiffs have not overcome the presumption that export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the basis for valuation of this merchandise.

3. That the record is insufficient to establish export values for the merchandise in these cases, other than the values found by the appraiser.

4. That export value in each case is the appraised value.

Judgment will be entered accordingly.