(R.D. 11684)

JOHN V. CARR & SON, INC. *v.* UNITED STATES

Entry Nos. 6738 ; 5707 ; 1819 ; 2629.

(Decided on remand November 28, 1969)

*Swafford, Jahn & Taylor; Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel), associate counsel; for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Bernard J. Babb* and *Velta A. Melmbrencis*, trial attorneys), for the defendant.

RICHARDSON, Judge: These appeals involve the proper dutiable value of merchandise which is described on each of the invoices as a "12'0″ Tamp-A-Door Baling Press." These baling presses, four in number, were exported at different times from Kingston, Ontario, Canada, and entered at Detroit, Michigan. They were manufactured in Canada by Canadian Locomotive Company, Limited, of Kingston, hereinafter

referred to as Canadian, for Chattanooga Welding and Machine Company of Chattanooga, Tennessee, hereinafter referred to as Chattanooga, and shipped to American customers of Chattanooga. It appears that the baling press is composed of two basic parts, namely, a superstructure and hydraulic power units or motors. Only the superstructure was made by Canadian. The motors were furnished and shipped by Chattanooga to Canadian, who, in turn, assembled them to the superstructure which it manufactured on orders from Chattanooga, and then exported complete to the United States. In each instance what was bought by Chattanooga and sold by Canadian consisted of only part of a machine, although what was delivered and imported into this country consisted of a complete machine. No charge was made by Canadian for the motors which it assembled to the press. And for each superstructure Chattanooga was billed in the amount of $55,000.00, U.S. dollars, by Canadian, according to the invoices on the basis of which entry was made by the plaintiff broker.

Upon appraisement the baling presses were advanced in value to $96,000.00 Canadian currency, per machine, net packed. This amount included the sum of $24,915.00 Canadian currency, per machine, which is representative of the amount for United States materials constructively segregable, namely, the motors which were entered as duty free American goods returned. The values of the motors are not in issue. What is in issue is the value of the superstructure. It was originally claimed by plaintiff that either United States value or cost of production constitutes the proper basis of valuation of the involved presses. However, upon final submission of the case plaintiff argued that there was no United States value and that only cost of production is the proper basis of valuation of the subject merchandise. Defendant contends that foreign value, represented here by the appraised values, constitutes the proper dutiable values of the merchandise by reason of plaintiff's failure to prove otherwise.

The evidence is both documentary and testimonial. Plaintiff's collective exhibit 1 consists of an affidavit of one W. David Stevens, sales manager of the Industrial and Process Equipment Division of Canadian Locomotive Company, Ltd., to which is annexed a form letter utilized by the manufacturer to offer the merchandise for sale, and a brochure illustrating the merchandise. According to the affidavit, and prior to the exportation of the subject merchandise, Canadian obtained a license from Chattanooga who had patent applications pending both in the United States and Canada relating to certain features of the baling press, to manufacture and to sell the press in Canada and in countries other than the United States. Mr. Stevens made attempts to sell the baling press in Canada but was not successful in doing so. Offers were made to metal scrap dealers in Canada, but no attempt

was made to sell to machinery dealers. Offers were made in the form of the aforesaid letter which gave dimensions of various types of presses offered, including the presses at bar, but did not mention a price.

To anyone interested in buying the press Canadian quoted a price of $96,000.00 (Canadian currency) f.o.b. the factory in Kingston, which price included engineering services and instruction in the installation and operation of the press and a year's warranty against faulty workmanship and defective materials. No sales were made, and Mr. Stevens was of the opinion that no market existed in Canada for the size press here involved, whose distinguishing attribute appeared to be its capacity to take a complete automobile body and in less than two minutes compress it into a standard size bale and eject it. To Mr. Stevens' knowledge no baling press of the kind here involved had been manufactured in Canada; and there was only one other baling press manufacturer in Canada whose product was of a smaller and different kind. The only baling presses which Canadian sold were the ones here involved; and during the period of these exportations Canadian did not quote a price to anyone for the baling press.

Plaintiff's collective exhibit 2 consists of an affidavit of Cecil I. Allen, president and treasurer of Canadian. The affiant states that the company's books and records pertaining to cost of production and sales of articles produced by the company were maintained under his supervision and direction, and that he has personal knowledge of the cost of production of the merchandise at bar. There then follows in the affidavit a statement of the cost of production figures covering only the superstructures of the subject baling presses which are said to be taken from company books and records. These figures are broken down into the categories of manufacturing costs, general expenses or overhead, an item of transportation expense which is included in the manufacturing costs, and profit. Cost of production figures relating to the involved invoices dated July 15th, July 26th, September 4th and September 20th, 1957, total $52,112.50, $51,975.00, $52,112.50 and $52,800.00, respectively, in Canadian currency. The affiant further states that he knows of only one other Canadian manufacturer of baling presses, that the product of such manufacturer is entirely different from the baling presses here involved, and that his company has been unable to ascertain the amount of profit realized by such other manufacturer from the sales of its baling presses because his company does not have access to the books and records of the other manufacturer.

Plaintiff's exhibit 3 consists of Letters Patent issued to Chattanooga by the United States Commissioner of Patents subsequent to the impor-

tation of the baling presses at bar, and based upon a previous application of the inventor, Mark L. Holt of Lookout Mountain, Tennessee. The patent covers certain design features of the subject baling press.

Plaintiff's exhibit 4 consists of a duplicate copy of a written contract entered into between Chattanooga and Canadian, dated October 25, 1956, setting forth the terms of the licensing agreement referred to in Mr. Stevens' affidavit (plaintiff's collective exhibit 1) in which Canadian obtained the right to manufacture and sell the subject baling press in Canada and countries other than the United States.

Plaintiff's exhibit 5 consists of a statement of operations and cost analysis of Chattanooga for the period between January 1, 1957, and December 31, 1957. This analysis includes transactions covering the sale of the involved baling presses as complete units by Chattanooga to its American customers, as well as some 15 other unrelated transactions.

Plaintiff's exhibit 6 consists of an affidavit of George A. Ferrier, manager of merchandise sales for United Steel Corporation Limited, of Toronto, Canada. Affiant states that he has knowledge of the articles manufactured and sold by his company in 1957, that such articles consist of hydraulic presses of various kinds, and that he also has knowledge of the competition encountered by his company during the year 1957. He states that Canadian was the only other manufacturer of baling presses in Canada during 1957, and that Canadian's product was of a different kind and character from that produced by his company, indicating the differences. He further states that although his company has been asked by Chattanooga's counsel to state the margin of profit realized by his company in 1957 from baling press sales, his company declines to do so because it considered such information to be an unrevealable, confidential trade secret.

Plaintiff also offered the testimony of John P. Williams, Jr., president of Chattanooga, who succeeded to that office upon the death of the former president, Mark L. Holt. Among other things, Mr. Williams testified that the subject power units *were manufactured in Chattanooga's plant*. Earlier, in testimony pertaining to a warranty included in the purchase price of the presses on sales by Chattanooga to its American customers, he said that the warranty covered parts of the equipment which either Chattanooga or Canadian manufactured, as opposed to *purchased items such as motors* or pumps.

And in connection with Chattanooga's sales of these presses Mr. Williams testified, in substance, that the first press (invoiced to Chattanooga July 15, 1957) was sold to Schnitzer Iron and Metal Company of Portland, Oregon, at a price of $90,000.00; the second (invoiced to Chattanooga July 26, 1957) was sold to Sandusky Steel and Supply

Co. of Sandusky, Ohio, for $90,000.00; the third (invoiced to Chattanooga September 4, 1957) was sold to Halsted Scrap Iron & Metal Company of Chicago, Illinois, for $93,326.05; and the fourth one (invoiced to Chattanooga September 20, 1957) was sold to Manfield Iron and Metal Company of Sterling, Illinois, for $93,500.00. All sales were made f.o.b. Kingston, Ontario, Canada. He further stated that with regard to the first two sales, Chattanooga placed its orders with Canadian before it negotiated sales contracts with the customers, but as to the last two sales, Chattanooga secured customers' orders before ordering the presses from Canadian.

The witness also testified that the difference in cost resulted from a variance in the cost of materials and labor, that the costs of each machine are computed separately, and that labor varies as high as 200 to 300 hours. He explained that although Chattanooga paid Canadian $55,000.00 per press, the labor costs varied on the power units produced by Chattanooga. As to how he arrived at general expenses of approximately $8,000.00 per machine, Mr. Williams stated that there were selling expenses averaging from $2,500.00 to $3,500.00 per customer which included costs of transportation, advertising, depreciation of equipment, and that this was based upon the dollar volume of sales. Other than commissions Mr. Williams stated that labor and material were included in the $8,000.00.

Plaintiff's exhibit 5 which was referred to hereinbefore was received in evidence during Mr. Williams' testimony. He described the document as being his company's comparative statement of operations and cost analysis for the year 1957 showing the costs of the machines manufactured during that year, and includes other work, the expenses of each machine and profit and loss of each transaction. The witness stated that the machines in question are included in the statement. He described the various items as labor, materials, burden, selling expenses, administrative expenses and financial expenses, and explained the sources of these figures.

The foregoing comprises the salient evidence submitted in support of the plaintiff's contentions. Defendant did not call any witnesses, but offered two documents which were received in evidence. Defendant's exhibit A consists of a letter dated August 26, 1958, written by W. D. Stevens, sales manager of Canadian to M. L. Holt president of Chattanooga. The text of the letter reads as follows:

Dear Mr. Holt:

In the absence of Mr. Saunders, who will be out of the office for a few days we wish to confirm the matter of pricing as discussed with you recently.

During the past two years we have endeavored to sell the 12 ft. press at our established selling price of $96,000.00. However, to

date we have been unable to complete any sales in Canada at this price.

We have promoted the sale of Holt presses with complete mailing list distribution of printed material. I have contacted many of the potential users of this equipment myself and our Mr. Hoar, who travels for us from coast to coast and also in the Canadian North, had done a very fine job in contacting the scrap metal industry.

It is quite evident that the selling price of this press will have to be reduced substantially if we are to obtain some portion of the Canadian market.

There is also an indication that a smaller unit would be more adaptable to the requirements of the potential users in this country.

Yours very truly,

(Signed)  W. D. Stevens,<br>
*Sales Manager*

And defendant's exhibit B consists of a letter dated March 20, 1958, written by C. H. Compeau, supervisor of cost, to the plaintiff relative to the baling press covered by entry #1819 in R60/5791 [invoiced July 15, 1957]. The text of this letter reads as follows:

Dear Sir:

Referring to your letter of March 17, 1958 re our invoice #56003 covering one baling press.

This merchandise is freely offered to anyone who wishes to purchase in the home market. When sold in the U.S. our agreement with Chattanooga states we can only sell to Chattanooga Welding & Machine Company. The price at the time of this particular sale to Chattanooga was $55,000, in U.S. Funds or $52,112.50 Canadian Funds. The price in the home market at that time would have been $52,112.50 Canadian Funds plus the commission or fee payable to Chattanooga Welding & Machine Company.

According to our licensed agreement with Chattanooga Welding & Machine Company we are obliged to pay them a commission of 10% of the Canadian Selling Price when presses are for home consumption. However, when presses are sold to Chattanooga this fee is not applicable.

The price shown above does not include the power unit which was supplied by Chattanooga.

The U.S. goods returned was the power unit supplied by Chattanooga, and the value was taken from the export declaration.

Trusting the above will help to clarify the matter in question.

Yours truly,

(Signed)  C. H. Compeau,<br>
Supervisor of Cost

Appraisement of the subject merchandise was made on the basis of foreign value. Plaintiff maintains that the evidence negates the existence of a foreign value because the baling presses were offered only to metal scrap dealers and not to machinery dealers, and hence, were not freely offered *to all purchasers* in Canada; and further, that restrictions in the form of price controls existed which preclude the existence of a foreign value. And insofar as United States value is concerned plaintiff takes the position that the evidence establishes the absence of prototype merchandise in the United States from Canada, the absence of which precludes the existence of United States value.

Defendant argues that the evidence fails to rebut the presumption of correctness attaching to the appraisement, and does not establish the absence of foreign and United States values for such merchandise. No question is presented in the record concerning the existence or non-existence of export value or of "similar" merchandise. There is uncontradicted evidence in the record that the subject baling presses were not offered for sale in Canada for exportation to the United States per force of territorial restrictions in the licensing agreement, that the presses contained such unique features as a contour hopper, and a combination tamp and door cover, and that merchandise similar in design and function was nonexistent in Canada at the time of exportation of the involved baling presses. I am, therefore, satisfied upon the instant record that export value is eliminated as a basis of value herein, and that as to the remaining bases of value "similar" merchandise is excluded as an element to be considered.

The pertinent provisions of 19 U.S.C.A., section 1402 (section 402, Tariff Act of 1930, as amended by the Customs Administrative Act of 1938) read as follows:

(a) [Basis] For the purposes of this chapter the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

(3) If the appraiser determines that neither the foreign value, the export value, nor the United States value can be satisfactorily ascertained, then the cost of production;

\*     \*     \*     \*     \*     \*     \*

## Foreign value

(c) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such mer-

chandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

## United States value

(e) The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed, ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

\* \* \* \* \* \* \*

## Cost of production

(f) For the purpose of this subtitle the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture

or production who are engaged in the production or manufacture of merchandise of the same class or kind.

At the outset it would be well to here dispose of one of two motions which were made during the course of the trial, and concerning which, decision was deferred by the trial judge for disposition with the decision in the case. Over objection of defendant's counsel plaintiff's counsel moved to strike the first sentence of the second paragraph of the letter contained in defendant's exhibit B on the ground that the sentence was a conclusion of law. The sentence in question reads: "This merchandise is freely offered to anyone who wishes to purchase in the home market." This sentence does not state a conclusion of law, but a conclusory statement of fact, and the court can determine the weight to be given to it. It is admissible in evidence as an integral part of the letter exhibited. Consequently, the motion to strike the sentence from defendant's exhibit B is denied.

The second motion before the court addresses itself to the merits of the controversy. At the conclusion of plaintiff's case defendant's counsel moved for a dismissal of the appeals on the ground that the evidence failed to negate the existence of foreign value as reflected in the appraised values, or to negate the existence of export and United States values. Decision was reserved on the motion by the trial judge.

Plaintiff is obliged to first negative the existence of foreign value, and, because of the elimination of export value as a factor, then to negative the existence of United States value, before undertaking to establish a cost of production value for the merchandise at bar. See 19 U.S.C.A., section 1402(a). On the matter of negating foreign value, plaintiff relies principally upon the affidavit of Mr. Stevens, the exporter's sales manager, received in evidence as plaintiff's collective exhibit 1. Plaintiff concludes from exhibit 1 that the subject presses were not freely offered for sale to all purchasers because of the existence of exclusionary practices, and because the quoted price of $96,000.00 for the 12 foot press included the services of an engineer to supervise installation and the training of the customer's operator, and a warranty of sorts, none of which services are associated with the price for the merchandise at bar, and further, that there was a restriction on the exporter's right to fix its selling prices.

I do not agree with plaintiff's contentions on the evidence as to foreign value. On the matter of *free offers* I am of the opinion that exhibit 1 goes no further than to establish the exporter's active solicitation of a particular class of customers, namely, the scrap metal dealers. Exhibit 1 does not disclose what role, if any, the machinery dealers played in the Canadian hydraulic press market, or indicate that offers by such machinery dealers or any other class of purchasers

to buy the subject presses were actually rejected by the exporter. And it is settled law that evidence of active solicitation of a particular class of purchaser without evidence of confinement of a market to such class of purchaser does not militate against the existence of a statutory market value. *Rico, Inc.* v. *United States*, 48 CCPA 110, 112, C.A.D. 773 (1961); *accord, H. H. MacDonaugh & Co. et al.* v. *United States*, 38 CCPA 36, 43, C.A.D. 436 (1950). In the instant case the contemporaneous admission of the exporter (defendant's exhibit B), to wit, "This merchandise is freely offered to anyone who wishes to purchase in the home market", is corroborative of the fact that at most the exporter actively solicited sales from only one class of purchaser without overtly excluding any class of purchaser from acquiring its merchandise. And on these facts the instant case is clearly distinguishable from the cases dealing with "selected purchasers" which are cited in the brief of counsel for the plaintiff.

On the matter of price the court is of the opinion that the $96,000.00 figure mentioned in exhibit 1 and again in defendant's exhibit A by the same person is a genuine price such as would qualify for utilization under the statutory foreign value formula. It is quite true that this price appears to have been above the Canadian market value of the subject baling press as of the periods of exportation here involved. But this is of no moment. Merchandise may be, and very often is, offered for sale at higher than its market value. *F. W. Kuehne Co.* v. *United States*, 12 Cust. Ct. 386, Reap. Dec. 5985 (1944), *affirmed*, 14 Cust. Ct. 356, Reap. Dec. 6110 (1945). And the statutory foreign value formula makes a *bona fide* price an acceptable substitute criterion for *intrinsic* market value.

Neither is it of any significance on the question of price that no sales were consummated at the quoted price of $96,000.00. It is enough, as is brought out through exhibit A, that the exporter *endeavored* to sell the press in the home market at the stated price for a period which included the periods of exportation here involved. *United States* v. *T. E. Ash et al.*, 22 CCPA 395, 402, T.D. 47401 (1934). And the requirement of the licensing agreement concluded between exporter and importer as contained in plaintiff's exhibit 4, to wit, "Canadian agrees that its selling prices shall be competitive with similar presses and neither arbitrary, unfair, nor unreasonable in relation to the cost of manufacture and markets where sold"—is added assurance that the stated price bears some relation to the exporter's cost of production, a factor which is indicative of the existence of foreign value. *Cf. Ziade* v. *United States*, 14 Ct. Cust. Appls. 47, 50, T.D. 41551 (1926).

As for the "services" included in the price of baling presses offered in the home market, I regard these services as revealing only the

dimensions of "the ordinary course of trade" in the home market with respect to the offer or sale of a commodity in that market which is essentially the same as the imported commodity as of the time of importation, and nothing more than that. And in my view it is implicit in the language of the statutory foreign value formula that identical market conditions for both the home market merchandise and the imported merchandise need not co-exist along with the existence of comparative merchandise in order for the formula to be applicable. It is not the price of the merchandise in the home market *per se* with which the statute is concerned, but rather the price of such merchandise *in the ordinary course of trade*. Thus, the divergence pointed to here by plaintiff's counsel with respect to market conditions is merely illustrative of such statutory permissiveness. And since the involved merchandise itself at the time of importation appears to be the same as that offered for sale in the home market the holding of the court in *E. Dillingham, Inc., et al.* v. *United States*, 46 Cust. Ct. 771, A.R.D. 129 (1961), which is cited as controlling by plaintiff, is distinguishable from the instant case on these critical facts, and as such, is not applicable here.

And finally on this phase of the case, I do not find that the above noted language of the licensing agreement relative to determination of prices of the baling presses has the effect of imposing any restraint upon the resale, use or disposition of the merchandise in the home market. It seems to me that this contractual language is merely expressive of optimum or salutary conditions under which any business could or should be conducted. Therefore, I cannot agree that reference to such language supports the contention that restrictions existed in the home market with respect to the offer and sale of the involved merchandise.

Inasmuch as there is no other evidence in the record which militates against the existence of foreign value as a basis or discredits the unit of value returned under that basis, it follows that plaintiff has failed to rebut the presumption of correctness attaching to the appraisement herein. As such, it becomes unnecessary to consider or discuss the other contentions made by plaintiff.

On the instant record, I find as facts:

1. That the merchandise herein consists of baling presses which were exported from Canada during the period between July and September of 1957, and appraised upon entry at the port of Detroit, Michigan, on the basis of foreign value as defined in 19 U.S.C.A., section 1402(c) (section 402(c), Tariff Act of 1930, as amended) at $96,000.00 Canadian currency, per machine, net packed.

2. That plaintiff has failed to prove that at the times of exportation of the baling presses covered by the entries herein that said baling

presses were not freely offered for sale for home consumption to all purchasers in the principal markets of Canada in the usual wholesale quantities and in the ordinary course of trade at the price of $96,000.00 Canadian currency, per machine, net packed. And on said facts, I conclude as matters of law:

1. That plaintiff has failed to rebut the presumption of correctness attaching to the appraised values herein.

2. That foreign value as defined in 19 U.S.C.A., section 1402(c) (section 402(c), Tariff Act of 1930, as amended) is the proper basis for determination of the value of the baling presses covered by the entries herein.

3. That such foreign value is represented herein by the appraised values.

Defendant's motion to dismiss the appeals herein is granted, and judgment will be entered accordingly.