(A.R.D. 283)

UNITED STATES *v.* THOMAS P. GONZALEZ CORP.

Third Division, Appellate Term

(Decided April 9, 1971)

*L. Patrick Gray, III,* Assistant Attorney General (*Robert E. Burke,* trial attorney) for the appellant.

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the appellee.

Before RICHARDSON and LANDIS, Judges, and ROSENSTEIN, Senior Judge

ROSENSTEIN, Judge: This application for review of the decision and judgment of the trial judge in *Thomas P. Gonzalez Corp.* v. *United States,* 63 Cust. Ct. 565, R.D. 11677 (1969), involves a shipment of 150 bags containing 7,500 kilos of garlic powder of the type and condition as shown by exhibit 5, produced and exported by Cia. Agricola de Ensenada, S.A. (hereinafter Agricola), of Ensenada, Baja California, Mexico, on April 6, 1964. The Special Customs Invoice indicates that the purchaser, the importer-appellee herein, paid $3.12 Mexican pesos per kilo, for a total of $23,400 Mexican pesos.

The merchandise was entered at $1,873 United States currency (applying the rate of exchange of .080056) and appraised at United States $0.363 per pound, net, plus cost of bags and packing. The basis of appraisement was export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165 [1] based, pursuant to section 402(f)(4)(D) of said Act, as amended, on the price of garlic powder produced and sold by Heinz Alimentos, S.A., Mexico, D.F., to United States purchasers.

Plaintiff below did not dispute the basis of appraisement but claimed that the proper export value was the invoiced and entered price of $3.12 Mexican pesos per kilo.

The pertinent provisions of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, are as follows:

> (b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

> \*        \*        \*        \*        \*        \*        \*

> (f) Definitions.—For the purposes of this section—
> (1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
>> (A) to all purchasers at wholesale, or
>> (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
> without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.
> (2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.
> (3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for

---

[1] The merchandise does not appear on the final list, T.D. 54521.

resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

> (A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

> (B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

> (C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

> (D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

The president of the importing corporation, Thomas P. Gonzalez, who has dealt in garlic powder since 1932, testified that the subject merchandise, which he saw in the process of production in Ensenada during March 1964, was manufactured in a "crude semifinished" state from garlic culls. The powder was semifinished as "they didn't have the equipment" to complete the process. The merchandise was unsalable in its imported condition, and he had to refinish, sift, remill, blend and repackage it, which cost him around 12 to 15 cents a pound, in United States currency.

In a letter dated March 5, 1964 (exhibits 1 and 1A), Agricola had offered him ground garlic packed in burlap bags weighing approximately 50 kilos net each at "$3.12 Mexican Currency per kilo F.O.B. Ensenada with American import duties for your account." He responded to the offer by letter (exhibits 2 and 2A) and received a firm offer from Agricola of 350 bags of garlic powder on the aforementioned terms (exhibits 3 and 3A).

The witness purchases a considerable amount of chili peppers from Agricola which he finances by advancing money against crops. But he gave no financial aid to Agricola with regard to garlic or garlic powder and had no agreement to limit offers of garlic powder to him. Neither party to the transaction owns stock in the other. Gonzalez had owned a dehydrating plant in Mexico which was sold prior to the

manufacture of the imported merchandise. The witness stated that Mexico is not known as a manufacturer of garlic powder which is produced only when there is a surplus of garlic. His recollection was that there was only one other manufacturer of garlic powder in Mexico, which was located in Salamanca, Guanajuato; but he did not recall if he had purchased garlic powder from it during the period involved herein.

Celestina Luna, "office administrator" of Agricola, testified through an interpreter that the seller is an agricultural cooperative which buys and sells the regional farm products such as beans, garlic and chili; that she supervises the sales and is familiar with the shipment at bar; that she was free to offer to whomever she wanted; that, at the direction of the partners, she prepared and sent out letters offering the garlic at $3.12 Mexican currency per kilo; and that she did not offer it at a higher price.

Office copies, kept in the regular course of business of her letters, dated February 15, 1964 to Comercial de Viveres, S.A., Calle Regina #144, Mexico, D.F., and February 20, 1964 to Sr. Gustavo Tarin, Apartado Postal #8193, Mexico, D.F., offering ground garlic in burlap sacks weighing 50 kilos, net, each, at $3.12 Mexican currency, f.o.b., and Sr. Tarin's letter of refusal, under the letterhead "Cia. Exportadora de Productos Agricolas, S.A." were received in evidence (collective exhibit 7). This merchandise, according to the witness, was manufactured from the "leftovers" and "of a low quality."

A copy of the certificate delivered to Mexican customs officials in connection with the entry at bar, which identified the merchandise, quantity, total price of $23,400 Mexican pesos, the ship and invoice number, was received in evidence (exhibit 8).

All of the garlic was sold to Mr. Gonzalez as "we couldn't sell it for any higher."

A copy of a page from Gonzalez' book of accounts receivable for Agricola (exhibit A) contains a line entry showing, on May 30, 1964, "Credit on garlic exported Inv. 1035, Posting Ref. 9642, credit $1772.00". Gonzalez testified that this was a credit to his running account with Agricola and that payment was "definitely" made to that firm.

An agent's report, dated November 10, 1966 (exhibit B), states that Heinz Alimentos, S.A., Mexico, D.F., sold garlic powder for export to the United States, f.o.b. Laredo, Texas, freight and duties paid. Invoices covering Heinz shipments of garlic powder in 300 pound drums to the United States subsequent to the period involved herein are attached as "exhibit H". The agent notes that documents covering shipments by Heinz during the relevant period could not be located.

The report does not indicate the quality of the garlic from which the powder was made or whether the latter was in a finished or semi-finished state.

Holding that the invoiced and entered value represents the value of the imported merchandise, the trial judge stated:

> Although the actual involved merchandise was freely offered to all prospective purchasers, but was eventually purchased by the importer herein does not negate the fact that it was freely offered for sale. In *National Carloading Corp.* v. *United States*, 43 Cust. Ct. 531, R.D. 9535 (1959), affirmed *United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125 (1961), the court, at page 534, stated: "* * * A manufacturer might offer his products to *all* purchasers who cared to buy, and his entire output might be taken by one purchaser, but that fact does not establish that he offered his merchandise *only* to the eventual buyer or that the ordinary course of trade was to offer and sell only to one buyer" (emphasis copied); and at page 535; "* * * the price to be adopted for valuation purposes in such situations is the FOB shipping port price, regardless of where the principal market is located." The shipping port of the imported merchandise is Ensenada, Mexico.

> \*        \*        \*        \*        \*        \*        \*

> On the evidence offered by plaintiff, it was up to the defendant to come forward with evidence to support its claim under section 402(f) (4) (D), which of course it failed to do by probative evidence of alleged sales of garlic powder produced and sold by Heinz Alimentos, S.A., Mexico, D.F., to the United States. Neither by cross-examination of plaintiff's witnesses, nor by documentary exhibits, has the defendant established by any patent or substantial evidence, that the dealings between Agricola and Gonzalez were other than a *bona fide* offer to sell and an offer to purchase and the purchase of the actual involved garlic powder at $3.12 per kilo, Mexican currency as invoiced. (Note commercial invoice and defendant's exhibit A, showing No. 1035 as the involved transaction.)

> Nor has the defendant produced evidence to offset the several offers to sell this identical merchandise to other prospective purchasers at the same price of $3.12 per kilo, Mexican currency, and at or about the same time. (Note collective exhibit 7 translated in the record at pages 53, 54 and 55.)

> It is apparent on the record that plaintiff has established a *prima facie* case for export value, section 402(b), *supra*, and under section 402(f) (1) (A), (4) (A), *supra*. It was therefore, not necessary to go to the basis for appraisement, to wit, section 402(f) (4) (D), *supra*.

His findings of fact included the following:

> 4. Plaintiff's oral and documentary evidence clearly establishes that the imported garlic powder was freely offered for sale to all prospective purchasers at or about the same time and at the same

price as invoiced and entered; that the importer purchased the available supply from the exporter consisting of 350 bags of 50 kilos each, of which quantity 150 bags thereof are herein involved.

5. The evidence introduced by the defendant consisting of exhabits A and B, as well as the cross-examination of plaintiff's witnesses, does not negate plaintiff's strong evidence of a *bona fide agreement* to sell and purchase the involved merchandise. [Emphasis supplied in part.]

Appellant, apparently of the belief that the trial judge found a "freely *offered* price" other than the appraised unit value (this, despite his finding, *supra*, as to "strong evidence of a *bona fide agreement* to sell") argues that the lower court should not have considered any offers in the absence of "proof of the non-existence of sales which would then allow a consideration of offers to sell" (brief, page 20); and goes on to urge that, in any event, appellee had failed to establish that the alleged offers were made to all purchasers for exportation to the United States.

We assign a different meaning to this opinion. As we read it, the trial judge found, based upon a detailed consideration of the record, including evidence of offers, that the merchandise was "freely sold" within the context of statutory export value.

As appellant correctly states, the requirement that export value, as defined in section 402(b), be the price "at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale * * *" precludes the court from considering even *bona fide* offers when, in truth and in fact, there are actual sales. *F. B. Vandegrift & Co., Inc.* v. *United States*, 60 Cust. Ct. 965, A.R.D. 239 (1968), affirmed *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 CCPA 105, C.A.D. 962 (1969); *Haddad & Sons, Inc.* v. *United States*, 56 Cust. Ct. 792, A.R.D. 205 (1966).

Inasmuch as the phrase "such or similar merchandise" is defined in section 402(f)(4)(A) to mean *in the first instance—*

> The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement—

merchandise produced by other manufacturers may not be considered if Agricola's selling price to Gonzalez represents export value. *Greb Industries Ltd.* v. *United States*, 64 Cust. Ct. 608, R.D. 11691, 308 F. Supp. 88 (1970); *United States* v. *F. W. Myers & Co., Inc.* 63 Cust Ct. 706, A.R.D. 264, 306 F. Supp. 1396 (1969); *Luckytex, Ltd.* v. *United States*, 63 Cust. Ct. 659, A.R.D. 257, 302 F. Supp. 1326 (1969); *W. J. Byrnes & Company* v. *United States*, 50 Cust. Ct. 406, R.D. 10451 (1963); *Chr. Bjelland & Co., Inc.* v. *United States*, 48 Cust. Ct. 593, R.D. 10213 (1962), affirmed *Id.* v. *Id.*, 51 Cust. Ct. 520, A.R.D. 161 (1963), affirmed *Id.* v. *Id.*, 52 CCPA 38, C.A.D. 855 (1965).

The term "freely sold or * * * offered for sale" is defined in section 402(f)(1) as "sold or * * * offered (A) to all purchasers at wholesale, or (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, without restrictions, * * *." Section 402(f) (1)(B) applies to a situation in which sales of the producer are restricted and it *selects* one or more purchasers, restricting its sales to them and not selling or offering its merchandise for sale to all purchasers at wholesale, *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846 (1964); *H. M. Young Associates, Inc.* v. *United States*, 60 Cust. Ct. 842, R.D. 11517 (1968), or where the seller imposes restrictions upon the free offering of merchandise which arbitrarily exclude certain purchasers or classes of purchasers from buying from the seller. *United States* v. *Getz Bros. & Co. et al.*, 55 CCPA 11, C.A.D. 927 (1967), and cases cited therein.

Although appellee bought the entire output of garlic powder, it is not a "selected" purchaser at wholesale within the meaning of section 402(f)(1)(B). There were no restrictions on the sale; Agricola did not refuse to sell to other prospective buyers. In fact, it was anxious to dispose of this semi-finished powder to anyone who would pay $3.12 pesos per kilo, f.o.b. Ensenada. The witness Luna's letters to Comercial de Viveres and Gustavo Tarin [2] corroborate her testimony as to Agricola's willingness to sell at the stated terms.

Purchase of the entire available quantity by one buyer does not make him a selected purchaser if the merchandise was freely offered on the same terms to all who cared to buy. *National Carloading Corp.* v. *United States*, 43 Cust. Ct. 531, R.D. 9535 (1959), affirmed *United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125 (1961); *H. M. Young Associates, Inc.* v. *United States, supra.*

Is appellee then a "purchaser at wholesale" to whom goods were "freely sold" within the ambit of section 402(f)(1)(A) ? We think so.

The phrase "freely offered for sale to all purchasers" in the "old" export value definition section of the Tariff Act of 1930, and now redesignated as section 402a(d) [3] has been construed to mean that the seller need not seek out all potential customers, or all those who might deal in the merchandise under consideration, as appellant suggests, but

---

[2] Appellant complains, perhaps facetiously, that it is not clear whether these prospective buyers are "other cooperatives * * * or taco stand owners", a matter which government counsel had ample opportunity to explore on cross-examination. *Kobe Import Co.* v. *United States*, 43 CCPA 136, C.A.D. 620 (1956). However Tarin's letterhead, "Cia. Exportadora de Productos Agricolas, S.A." indicates that he exports farm products.

[3] The change in the export value definition from "freely offered for sale" to "freely sold or, in the absence of sales, offered for sale" does—

* * * not involve substantive changes in the valuation basis, but would merely make explicit in the statute that actual sales as well as offers for sale might be considered in determining dutiable value.

Excerpt from memorandum submitted by Tariff Commission at hearings held by House Committee on Ways and Means on H.R. 6040, subsequently enacted as Customs Simplification Act of 1956.

that he shall treat all persons who care to buy his goods in the ordinary course of trade on an equal footing. *Inter-Maritime Forwarding Co., Inc.* v. *United States*, 65 Cust. Ct. 814, A.R.D. 278, 318 F. Supp. 218 (1970), appeal pending. Thus, evidence of active solicitation of certain purchasers without evidence of confinement of a market to such purchasers does not militate against the existence of a statutory market value.[4] *John V. Carr & Sons, Inc.* v. *United States*, 63 Cust. Ct. 612, R.D. 11684 (1969).

That is the situation we have here. The sale under consideration was a *bona fide* transaction that was freely made, based upon offers made without restrictions to all purchasers within the meaning of the statute. The inferences appellant attempts to draw from Gonzalez' dealings with Agricola in connection with other farm produce, not of the same class or kind, or from the fact of his former ownership of a dehydrating plant in Mexico, which was sold prior to February 1964, do not support a finding, with respect to the subject merchandise, of a controlled market or of a transaction made other than at arm's length. The testimony of appellee's witnesses [5] regarding the circumstances of the sale of the instant merchandise, which was corroborated by documentary evidence, stands unrefuted.

Appellant also argues that appellee made no attempt to prove the "ordinary course of trade" in Mexican garlic powder and that this was part of its burden in establishing all the statutory elements of export value.

Appellant confuses the application of this phrase in the export value definition (where it has appeared since the latter was first introduced into the valuation scheme in the Emergency Tariff Act of 1921) with the new emphasis it has acquired, under the amending provisions of the Customs Simplification Act of 1956, in the context of the now permissible consideration of sales to selected purchasers.[6] And in this connection, we note appellant's citation of and total reliance upon

---

[4] As our court of appeals stated in *Rico, Inc.* v. *United States*, 48 CCPA 110, 112, C.A.D. 773 (1961) :

"Offered for sale" does not require solicitation of customers, nor does it require that the goods be so packaged as to meet the needs of all customers. * * * It would seem that to defeat the conception of a free offering the restriction would be one involving some form of marketing practice resulting in the arbitrary exclusion from the market of certain customers or classes of customers by a refusal to sell to them on an equal footing with others, or at all.

[5] The analysis of testimony and evaluation of a witness is a delicate matter for which a trial judge is particularly well suited by reason of his proximity to the witness. In a case such as this, where testimony of one witness is given through an interpreter and some difficulties are encountered, as here, in the translation, the views of the trial judge should be given great weight and not be lightly dismissed on appeal. See *United States* v. *Louis Goldey Co., Inc., et al.*, 64 Cust. Ct. 868, A.R.D. 275 (1970), appeal pending.

[6] The definition given in section 402(f)(2) for "ordinary course of trade" is presumably applicable to that term where used in both sections 402(b) and 402(f)(1)(B). *Chr. Bjelland & Co., Inc.* v. *United States*, 45 Cust. Ct. 435, R.D. 9753 (1960).

cases dealing with selected purchasers under section 402(f)(1)(B), although we are considering here a sale to "purchasers at wholesale" within the meaning of section 402(f)(1)(A).

Statutory export value envisages a market in which goods are freely sold or freely offered for sale unhampered by restrictive practices which might create a controlled market. Our court of appeals stated in *United States* v. *Getz Bros. & Co. et al.*, 55 CCPA 11, 21, C.A.D. 927 (1967):

> The applicable provisions of section 402a(d) and 402(b) of the tariff laws both require, in finding "export value," that the merchandise must be freely sold or offered for sale to all purchasers in the ordinary course of trade. These requirements, as used in section 402, have been interpreted to mean that the merchandise must be "freely sold" or "offered for sale" to "all those who cared to buy such goods in such market" in the ordinary course of trade. Moreover, the merchandise need not be freely offered to all purchasers without limitation, but rather "in the ordinary course of trade." *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590 (1955); *United States* v. *American Glanzstoff Corp.*, 24 CCPA 35, T.D. 48308 (1936).
>
>   \*      \*      \*      \*      \*      \*      \*
>
> In our view, requirements imposed by a sovereign which control the flow of goods from the country of the sovereign for a variety of reasons, do not prevent the lower court from finding that a free market existed. The existence of such a requirement does not defeat the concept of a "free offer" by the seller. Requirements such as quota limitations are clearly distinguishable from restrictions upon the free offering of merchandise imposed by the seller which arbitrarily exclude certain purchasers or classes of purchasers from buying from the seller. \* \* \*

Thus, the "ordinary course of trade" contemplated by sections 402(b) and 402a(d) is the trade "in which such or similar goods are 'freely offered for sale to all purchasers' in the usual wholesale quantities". *United States* v. *H. W. Robinson & Co., et al.*, 19 CCPA 274, 276, T.D. 45436 (1932); *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T.D. 42216 (1927). Therefore, if merchandise is freely sold or offered for sale without restrictions to all purchasers who care to buy in that market the sales or offerings are, in the absence of a contrary showing, in the ordinary course of trade. As Judge Nichols stated, in *Superior Merchandise Company* v. *United States*, 54 Cust. Ct. 781, 790, A.R.D. 185 (1965):

> \* \* \* The term "all purchasers" is not without limitation but is qualified by the phrase "in the ordinary course of trade." *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590. It means all who are within the class of customers to whom the merchandise is useful. \* \* \*

Section 402(f)(1)(B), however, involves a different situation.[7] It authorizes consideration of sales restricted to one or more selected purchasers where there is an absence of sales or offers of sales to all purchasers at wholesale, *provided* that such sales are made in the "ordinary course of trade" at a price which fairly reflects market value and without restrictions as to disposition or use of the merchandise by the purchaser. *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841 (1964).

Thus, where sales are restricted to a selected purchaser, it is entirely appropriate and proper, in order to eliminate the possibility of a rigged market price, to examine the conditions and practices which were normal and usual in the trade with respect to merchandise of the same class or kind as that under consideration. *United States* v. *Acme Steel Company, supra; Inter-Maritime Fwdg Co., Inc.* v. *United States*, 51 Cust. Ct. 529, A.R.D. 162 (1963). Accordingly, the responsibility devolves upon a party plaintiff, if it is a "selected purchaser", to establish that the sales or offers of sales were made to it in the ordinary course of trade, as defined in the valuation statute, and that such sales fairly reflected the market value of the merchandise. *Henry Picard, Jr.* v. *United States*, 57 Cust. Ct. 689, R.D. 11242 (1966).

The distinction between (A) and (B) of section 402(f)(1), in terms of proofs, was succinctly set out by Judge Donlon, in *W. J. Byrnes & Company* v. *United States, supra,* in the following passage:

> In determining whether goods are freely sold or, in the absence of sales, are offered for sale, the meaning Congress intended is specifically stated in section 402(f)(1). Proofs include either sales to all purchasers at wholesale, *or* "in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise * * *".

The affirmative proofs required in connection with section 402(f)(1)(B) do not come into play here as the record establishes that the

---

[7] In the memorandum submitted to the House Committee on Ways and Means on the proposed bill amending section 402, the Tariff Commission stated:

Subsection (f) of the proposed new version of section 402 is a new provision defining certain significant phrases used in the various definitions of valuation which have been the subject of a century of litigation. The first and second definitions can be treated together and are designed to overcome the controlled-market doctrine developed by the customs courts, which has had the effect of precluding the use of the primary method of valuation in a great number of cases. As interpreted by the courts, our valuation laws have failed to keep abreast of the developments of modern commerce. It was held that the terms "freely offered for sale" and *"ordinary course of trade"* preclude the *consideration of sales and offers for sale which were accompanied by various restrictions on the use or disposition of the goods undergoing sale.* The definitions in clauses (1) and (2) of subsection (f) recognize accepted modern-day conditions and practices in commerce and will greatly increase the opportunity for use of the primary method of valuation in determining dutiable value of imported merchandise. [Emphasis supplied.]

transaction at bar was a *bona fide* one made to a purchaser at wholesale within the meaning of section 402(f) (1) (A).[8] It is the not unusual situation where a manufacturer, desirous of selling off-quality or distress merchandise, solicited prospective interested purchasers, offering it on the same terms to all, and found a buyer willing and able to purchase the entire available quantity. See *Superior Merchandise Company* v. *United States, supra.* This appears to us to meet the concept of a market in which goods are "freely sold". In the absence of evidence to the contrary, we do not find this manner of doing business to be outside the pale of accepted business practice so as to require an export value based on actual sales or offers thereof by others in the industry.

This court finds as facts:

1. That the subject merchandise consists of 150 bags, totaling 7,500 kilos, of garlic powder manufactured from culls of fresh garlic, produced by Cia. Agricola de Ensenada, S.A., Ensenada, Baja California, Mexico, and exported on April 6, 1964. The merchandise was invoiced at $3.12 Mexican pesos per kilo for a total of $23,400 Mexican pesos, and entry was made at $1,873 United States currency, using the rate of exchange of .080056.

2. That the merchandise was appraised on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at United States $0.363 per pound, net, plus cost of bags and labor (packing), based, pursuant to section 402(f) (4) (D) of the Tariff Act of 1930, as amended, *supra*, on the price of garlic powder produced and sold in 300 pound drums by Heinz Alimentos, S.A., Mexico, D.F. to United States purchasers.

3. That on or about the date of exportation, such merchandise was freely offered for sale to all prospective purchasers in the principal markets of Mexico, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, in 50-kilo bags at $3.12 Mexican pesos per kilo, f.o.b. Ensenada; and that the entire available quantity was freely sold to the importer, a purchaser at wholesale.

This court concludes as matters of law:

1. That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended, *supra*, is the proper basis of appraisement of the subject merchandise.

2. That the export value is the invoiced and entered value herein.

Judgment will be rendered accordingly.

---

[8] The trial court's findings as to principal markets and usual wholesale quantities are not in issue herein.