(C.D. 4501)

Mitsubishi International Corp. v. United States

Court No. 71–12–02054

(Decided March 5, 1974)

*Glad, Tuttle & White* (*Edward N. Glad* of counsel) for the plaintiff.

*Irving Jaffe*, Acting Assistant Attorney General (*Patrick D. Gill* and *David A. Ast*, trial attorneys), for the defendant.

Richardson, Judge: The merchandise in this case consists of plywood which was exported from Japan and appraised upon entry at the port of New Orleans, La. under the export value basis of appraisement as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at either $142.50, $155.00, or $165.83, United States dollars, per

thousand square feet. Plaintiff-importer alleges in its complaint that the proper export value of the merchandise is $115.00, United States dollars, per thousand square feet, f.o.b. Japanese port.

The record in the case consists of the testimony of Kenji Matsuo, manager of the general merchandise B section of the Los Angeles office of the plaintiff corporation, called as a witness on plaintiff's behalf; an affidavit of Hideaki Mori, chief of the domestic sales section for fancy plywood of Eidai Co., Ltd., of Osaka, Japan, dated April 19, 1973, and received in evidence as plaintiff's exhibit 1; a report of Jerry L. Kane, Customs Representative, dated January 17, 1973, received in evidence as defendant's exhibit A; and the official entry papers.

In its brief plaintiff modifies its claim, and now contends that the proper export value of the subject merchandise is $119.35 per thousand square feet, f.o.b. Japanese port, based upon the initial sales price of the manufacturer Eidai Mokuzai Kogyo, K.K. of ¥42,697 per thousand square feet, f.o.b. Kobe. The defendant does not question this contract price, and concedes that it converts to $119.35. (Defendant's brief, p. 21.) However, defendant did point out that Hideaki Mori stated in both of his affidavits that the price was stable at approximately ¥46,700 which converts to $130.54, according to defendant. Since plaintiff's claim is confined to the existence of export value at the mill or manufacturer's level, only certain portions of the record in the case are pertinent to this inquiry.

Kenji Matsuo testified on direct examination that for some 18 years prior to his employment by plaintiff, including the relevant period between 1969 and 1970, he was a staff member of Mitsubishi Corporation in Tokyo, Japan, working in the lumber department which handled all kinds of wood and construction materials where he was involved with the exportation of plywood. He stated that his activities then consisted mainly in selling wood products to the United States; that when Mitsubishi Tokyo received orders from plaintiff for rustic plywood he placed the orders with one of two mills, namely, the Eidai mill or the Asahi mill, for the account of Mitsubishi Tokyo; that he was familiar with the prices that Eidai was charging for its rustic, standard grade, wide-grooved walnut plywood; and that such price was $115.00 (R. 16).

On cross-examination Matsuo identified the manufacturer of merchandise described on the invoice in entry 108000 and on invoice 36–113(C) of entry 117483 as Eidai Mokuzai Kogyo, K.K. He testified that during the 1969 and 1970 period Mitsubishi Tokyo was selling all over the world, that he was involved with sales of this merchandise to countries outside of the United States, and that sales of fancy plywood to the United States from Japan accounted for approximately

33 percent of Japan's export sales, because, as far as fancy plywood was concerned, Europe was one of Japan's biggest markets.

Invoices in all of the entry papers in the case disclose that the merchandise in issue was manufactured by Eidai Mokuzai Kogyo, K.K.

Hideaki Mori was first interviewed by Customs Representative Kane on January 8, 1973, and the substance of that interview, reduced to affidavit form, is identified as exhibit C in the Kane report (defendant's exhibit A). Mori subsequently executed another affidavit dated April 19, 1973, which is in evidence as plaintiff's exhibit 1. In the Kane interview, Mori's attention was directed to the shipments involved herein which were identified as rustic grade, standard quality, unfinished, American black walnut, ¼" x 4' x 8', mismatched, V-grooved, color-toned, black putty filled plywood according to E. L. Bruce Co. specifications of Eidai manufacture. Mori was then questioned as follows:

Q. 2: Was this merchandise sold or offered only to Mitsubishi Shoji?

A. 2: No, this merchandise was offered to all Japanese exporters at the same terms but Mitsubisubishi [sic] was the only one who purchased it during the time in question.

Q. 3: Did your firm actually make the sale to Mitsubishi or was the sale to someone else through Mitsubishi? Please document the prices and names of customers.

A. 3: As I mentioned before, Mitsubishi was the only buyer at that time. We don't have the records available for such an old sale but the price was stable at approximately ¥46,700.0 per thousand square feet at FOB Kobe terms.

Q. 4: Did your firm offer to sell this merchandise directly for export to the United States or to a reseller in Japan? Document your answer.

A. 4: We offered to sell this merchandise at the same prices to exporters in Japan. If an American firm has offices here, they could have purchased it. We don't deal with firms that don't have offices here because of the problems with international credit. We cannot document offers since they were made over the telephone but our regular customers for this merchandise are Nichimen and Nissho-Iwai in addition to Mitsubishi.

Q. 5: Describe the manner and relationship of the transactions between your firm and Mitsubishi.

A. 5: There is no special relationship between us. Mitsubishi just calls and requests a price quotation and delivery date for a certain quantity of plywood and we respond with a price. If it is agreeable with their side, they issue a purchase order a week later and we start production. When the merchandise is ready, they tell us how to mark it and we put it on board ship and finally recieve [sic] payment.

Q. 6: Did you sell the merchandise directly to Mitsubishi Shoji and not for export to the United States?

A. 6: No, we know that this merchandise was to be exported for several reasons. First the terms specified FOB Kobe port and we knew that it was bound for an American firm who would finish it. Walnut plywoods are not popular in Japan and all of our domestic plywood is finished.

In his later affidavit Mori, addressing himself to the same subjects on which he was earlier interviewed by Customs Representative Kane, averred:

That during this period [July, 1969, through February, 1970] our firm offered this merchandise to all Japanese exporters *or to American firms with offices in Japan* at the same terms as this merchandise was sold to Mitsubishi Shoji. We do not deal with firms that do not have offices in Japan because of the problems with international credit. However, during this period Mitsubishi Shoji was the only one to purchase this merchandise. We do not have the records available for such old *sales* but the price was stable at approximately ¥46,700 *or $115.00* per thousand square feet at FOB Kobe terms.

That there is no special relationship between Mitsubishi Shoji and ourselves. Mitsubishi Shoji just calls and requests a price quotation and delivery date for a certain quantity of plywood and we respond with a price. If it is agreeable with their side, they issue a purchase order a week later and we start production. When the merchandise is ready, they tell us how to mark it and we put it on board ship and finally receive payment. [Emphasis added.]

Yoshihiro Tokuda, employed in the South Sea lumber section C of the Mitsubishi Corporation in Tokyo, was also interviewed by Customs Representative Kane on December 29, 1972 (defendant's exhibit A, exhibit B attached thereto). He stated that he actually participated in the "sales negotiations" between Eidai and Mitsubishi Shoji. Also, Sadao Kurosawa, managing director of the Japan Plywood Exporters' Association of Tokyo (of which Mitsubishi Shoji was a member and its representative was a director), in answer to the 26th question on his affidavit in exhibit A stated ". . . prices were subject to bargaining but I cannot say by how much nor how often they varied because I did not have access to price information." Tokuda further stated:

Q. 2: Was your firm a reseller for export of the merchandise purchased from Eidai Mokuzai K.K. during this period? If so, document the dates of purchase and the prices.

A. 2: Yes, we were a reseller but we purchased the plywood in question from Eidai Sangyo. Eidai Mokuzai was the actual manufacturer but we purchased from Eidai Sangyo, the sales division of the parent corporation. All of the merchandise in the shipments in question was purchased on one contract. I have attached

a copy of this contract as Exhibit A to this affidavit and that contract shows that a total of 960,000 square feet were purchased on March 29, 1969 for 42,697.0 yen per thousand square feet. This price was for F.O.B. Kobe or Osaka port, COD terms.

\* \* \* \* \* \* \*

Q. 6: Was your firm instrumental in having Eidai produce the walnut plywood to E. L. Bruce specifications?

A. 6: I don't think so. This particular plywood was very popular at that time so Eidai was probably already manufacturing it. It [sic] not, the written specifications would be sufficient for a factory to set up for this particular pattern as not much preparation is required by a factory which is already manufacturing rustic grade fancy walnut plywoods.

Examination of the Eidai-Mitsubishi Shoji contract referred to in the Tokuda interview discloses no reference or notation as to the destination of the 960,000 square feet of plywood involved.

Takeshi Kinugasa, chief of the export department of Asahi Fancy Plywood Co., Ltd., of Osaka, Japan, was interviewed by Customs Representative Kane on January 8, 1973 (exhibit D of defendant's exhibit A). Kinugasa responded in part:

Q. 1: Mr. Kinugasa, according to our Customs records, your firm sold rustic grade, standard quality, unfinished, American Black Walnut ¼″x4′x8′, mismatched, V-grooved, color-toned, black putty filled plywood which was manufactured according to E. L. Bruce Co. specifications during the period corresponding to shipments made from July, 1969 through February, 1970. Were you associated with these shipments? If so, please describe how as well as your duties with Asahi.

A. 1: Yes, as Chief of the Export Section, I was responsible for negotiating prices for this merchandise, arranging delivery details and maintaining liaison with the buyer. I have acted in this position for the past six years.

\* \* \* \* \* \* \*

Q. 5: Would the price of this merchandise change if there was a change in the specifications regarding color-toning or black putty filling?

A. 5: In order to be considered rustic, this plywood must meet those standards. A change in color isn't a significant factor in pricing. *The statement about E. L. Bruce specifications only reflects a less popular pattern of spacing the grooves on standard merchandise.* [Emphasis added.]

Plaintiff argues that the evidence of record supports the conclusion that the subject merchandise was the subject of a sale for exportation to the United States at the mill level which complies with all of the requirements of the statutory export value formula, in this case, sec-

tion 1401a(b). As to the imported merchandise, plaintiff says in its brief:

> As there was a freely sold price of such merchandise at the mill level, said price, being stable during the period in question, must be used for determining export value as defined in Section 402(b). This price is ¥42,697 or $119.35 per thousand square feet, F.O.B. Japanese port.

With respect to merchandise other than the imported merchandise, plaintiff argues:

> . . . that Eidai offered this merchandise on the same terms as offered to Mitsubishi to any others who were in a position to buy; and that during the period in question the price was stable. . . .

Defendant argues that the evidence does not support the conclusion that the imported merchandise was sold by Eidai to Mitsubishi Shoji for exportation to the United States, that the contract price underlying the mill's price to Mitsubishi Shoji was below the mill's offering price, was not shown to be for the usual wholesale quantity, or the price at the time of exportation of the imported merchandise, and represented a price which was arrived at by bargaining or negotiation.

The applicable statutes read as follows:

[Section 1401a(b)]

For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

[Section 1401a(f)(4)(A)]

(f) For the purposes of this section—

*       *       *       *       *       *       *

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value . . . can be satisfactorily determined:
(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

The Court is of the opinion that on the basis of the evidence of record plaintiff has failed to establish an export value for the involved

merchandise based upon Eidai's price to Mitsubishi Shoji, i.e. ¥42,697. Although the evidence shows that the imported merchandise was initially sold at this price, that price does not qualify in this case as a basis for establishing statutory export value even if we assume that the transaction was a sale for exportation to the United States. It is not contended in this case by plaintiff that Mitsubishi Shoji was a "selected purchaser". Consequently, export value may not be predicated alone upon the basis of the price paid for the imported merchandise. *Agricolas de Mexico, S. de R.L. de C.V.* v. *United States*, 66 Cust. Ct. 612, 618, A.R.D. 285 (1971) In this case there must be evidence that the claimed price was the price at which this merchandise was freely offered to all purchasers at wholesale during the period in question, i.e., July, 1969, through February, 1970, for exportation to the United States. *United States* v. *Thomas P. Gonzalez Corp.*, 66 Cust. Ct. 597, 603, A.R.D. 283 (1971).

In the *Gonzalez* case the merchandise was garlic powder produced in Mexico by Cia. Agricola de Ensenada, S.A. whose entire output was purchased for exportation to the United States by the importer Thomas P. Gonzalez Corp. at a price of $3.12 Mexican currency per Kilo, f.o.b. Ensenada. The court found this sales price to be a freely sold price within the meaning of statutory export value, based upon free offers at that price for exportation to the United States. To the same effect is the holding of the court in *United States* v. *Getz Bros. & Co. et al.*, 55 CCPA 11, C.A.D. 927 (1967), involving plywood doorskins manufactured by some 25 Japanese mills. On this point our appeals court, in affirming the lower court, called attention in the *Getz Bros.* case to the opinion of the trial court where, in assessing the evidence of record, the trial court stated:

> It appears to the court that the facts in the present cases [sic] are stronger in support of finding that the sales by the manufacturing mills provide the proper basis for determining export value than are the facts in the previously decided cases. In the present case, certain facts are established by a heavy preponderance of evidence. In the affidavits offered in evidence by the plaintiffs, all of which are substantially the same, it definitely appears that all the manufacturing establishments from which purchases were made in the appealed cases herein offered their merchandise for sale to all purchasers who desired to buy for export to the United States and not merely to the so-called trading houses.

In the instant case there is no persuasive evidence that Eidai offered the plywood in issue to all purchasers at wholesale in Japan for exportation to the United States. The initial Mori affidavit (affidavit C of defendant's exhibit A) averred that Eidai offered the merchandise to Japanese exporters, the chief customers being, in addition to Mitsu-

bishi Shoji, Nichimen and Nissho-Iwai—asserting only that *if* an American firm had an office in Japan, it *could have* purchased the merchandise.

Bearing in mind the facts, as developed in the record, that the E.L. Bruce Co. specifications were not an indication of destination of plywood but rather a pattern of design on plywood, and that only 33 percent of this fancy plywood was exported to the United States, the initial Mori affidavit does not establish that the offering mentioned therein was for exportation to the United States.

Of course, the second Mori affidavit does undertake to supply this deficiency in proof in the averment:

> That during this period our firm offered this merchandise to all Japanese exporters or to American firms with offices in Japan at the same terms as this merchandise was sold to Mitsubishi Shoji....

But nowhere under point III of its brief, plaintiff's exhibit 1 notwithstanding, does plaintiff contend that the evidence establishes that at the times in question the subject merchandise was freely offered for sale by Eidai in Japan to all purchasers at wholesale for exportation to the United States. At most, plaintiff, under point III of its brief asserts "that Eidai offered such merchandise during the period in question at the same terms as sold to Mitsubishi, Tokyo, to *others*. . . ." (Emphasis added.)

Thus, it appears that plaintiff is aware that the belated statement of Hideaki Mori noted above contained in plaintiff's exhibit 1 [wherein he undertakes to modify his earlier statement contained in affidavit C of defendant's exhibit A] does not contain the necessary proof required by the statute to establish export value. And neither does the court attach credence to this statement in exhibit 1 in view of the fact that exhibit 1 does not aver that there were in fact any American firms with offices in Tokyo at the time or undertake to identify any such firms— thereby removing the *speculation* on this point created by the first Mori affidavit.

Plaintiff has not established that there was a freely sold or offered price to all purchasers for export to the United States. Therefore, on the record in this case, the court finds as facts:

1. That the merchandise in this action consists of A.B. Walnut MM-VG rustic standard grade wide-grooved walnut plywood manufactured in Japan by Eidai Mokuzai Kogyo, K.K. and exported from Japan between July, 1969, and February, 1970.

2. That said merchandise was appraised upon entry at the port of New Orleans, La. on the basis of export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by

the Customs Simplification Act of 1956) at either $142.50, $155.00, or $165.83 per thousand square feet.

3. That there is no evidence in the record that establishes that at the time of exportation of said merchandise there was such merchandise freely sold, or, in the absence of sales, offered for sale in the principal markets of Japan by the manufacturer or its representatives to all purchasers at wholesale for exportation to the United States.

Upon these facts the court finds as matters of law:

1. That export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for determination of the value of the merchandise herein.

2. That plaintiff has not established an export value different from that returned in the appraisement of said merchandise.

3. That the appraised values of said merchandise remain in full force and effect by reason of plaintiff's failure to overcome the presumption of correctness attaching to the appraisement.

Judgment will be entered herein accordingly.